DETROIT POLICE OFFICERS ASSOCIATION v CITY OF DETROIT

1. LABOR RELATIONS—MUNICIPAL CORPORATIONS—POLICE—RESIDENCY
REQUIREMENT.
   A city is entitled to impose a residency requirement upon its
   police and is not required to bargain collectively with them
   regarding that requirement.

2. LABOR RELATIONS—MUNICIPAL CORPORATIONS—PENSION—COLLECT-
IVE BARGAINING.
   Pension and retirement terms are an essential part of the terms
   and conditions of municipal employment, making them a man-
   datory subject for collective bargaining with a city employees'
   union.

3. LABOR RELATIONS—MUNICIPAL CORPORATIONS—CHARTER—PUBLIC
EMPLOYMENT RELATIONS ACT—CONFLICT.
   Prospective changes in a pension and retirement system for city
   employees are mandatory subjects of collective bargaining un-
   der the Public Employment Relations Act and a city cannot
   submit such changes to the electorate for approval even though
   the retirement system is a part of the city charter amendable
   solely by popular vote (MCLA 423.215; Detroit Charter, Tit 9,
   ch 7).

4. LABOR RELATIONS—MUNICIPAL CORPORATIONS—COLLECTIVE BAR-
GAINING.
   The City of Detroit's failure to bargain in good faith with the

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 56 Am Jur 2d, Municipal Corporations, Counties, and Other
   Political Subdivisions § 132.
   Matters pertaining to police department as within exclusive control
   of municipalities under home-rule charters, 105 ALR 259.
[2] 40 Am Jur, Pensions § 19.
   48 Am Jur 2d, Labor and Labor Relations §§ 221, 674.
   56 Am Jur 2d, Municipal Corporations, Counties, and Other Politi-
   cal Subdivisions § 247.
[3] 48 Am Jur 2d, Labor and Labor Relations § 674.
[4] 48 Am Jur 2d, Labor and Labor Relations § 546.
[5] 48 Am Jur 2d, Labor and Labor Relations § 1191.

police officers' association regarding prospective changes in the police retirement and pension system was an unfair labor practice remediable by a Michigan Employment Relations Commission order to compel the city to bargain on that subject.

5. LABOR RELATIONS—MUNICIPAL CORPORATIONS—CITY CHARTER— PUBLIC EMPLOYMENT RELATIONS ACT—CONFLICT.

The Public Employment Relations Act is a general law of the state under the Home Rule Act and prevails over the provisions of any city charter (MCLA 117.36; 423.215).

Appeal from the Employment Relations Commission. Submitted Division 1 February 8, 1972, at Detroit. (Docket No. 11477.) Decided July 18, 1972. Leave to appeal granted, 388 Mich 807.

Complaint by Detroit Police Officers Association against the City of Detroit before the Employment Relations Commission alleging unfair labor practices. Defendant appeals from that part of the Commission's decision and order finding in favor of the plaintiff. Affirmed.

*Winston L. Livingston* (by *J. Douglas Korney),* for Detroit Police Officers Association.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Francis W. Edwards,* Assistant Attorney General, for Michigan Employment Relations Commission.

*Michael M. Glusac,* Corporation Counsel, *Nick Sacorafas* and *Ronald Zajac,* Assistants Corporation Counsel, for the City of Detroit.

Before: BRONSON, P. J., and V. J. BRENNAN and ᘎ'HARA,* JJ.

O'HARA, J. Once again we become arbiter in the

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

continuing tug-of-war between the municipalities asserting their rights under the "Home Rule Act" [1] and the rights of municipal employees who are denied the legal right to strike,[2] but who are also granted the right to collective bargaining representation.[3]

Because of the length of the names of the parties and the concerned agencies and a statute, namely the Detroit Police Officers Association, the City of Detroit, the Michigan Employment Relations Commission and the Public Employment Relations Act, we will use throughout the opinion the acronyms DPOA, MERC, PERA and refer to the City of Detroit simply as the "City".

With the adoption in 1965 of § 15 of the PERA,[4] municipalities became bound to bargain collectively with the representatives of their employees. Accordingly, the City recognized the DPOA as the bargaining representative of all patrolmen and policewomen of the Detroit Police Department on January 18, 1966. Negotiations for a collective bargaining agreement began in March, 1966 between the City and the DPOA and continued with interruptions through the spring of 1968. This case grows out of the complexities of those negotiations.

It would appear from the record that both parties approached the bargaining table with certain preconceived objectives. In addition to the traditional wage demands, the representatives for the DPOA sought to remove a 30-year-old residency requirement as a condition of employment. The DPOA also opposed the lowering of several recruitment qualifications initiated by the police commis-

---

[1] MCLA 117.1 *et seq.;* MSA 5.2071 *et seq.*

[2] MCLA 423.202; MSA 17.455(2).

[3] MCLA 423.211; MSA 17.455(11).

[4] 1965 PA 379, § 15; MCLA 423.215; MSA 17.455(15).

sioner apart from negotiations.[5] The City, for its part, sought to initiate certain changes in the Policemen and Firemen Retirement Systems, (Detroit Charter, Title 9, Ch 7) recommended by the Mayor's Task Force Committee on City Finances. The proposed changes were to provide: (1) a retirement pay of 2% of average final compensation for each year of service without a ceiling of 50%; (2) a minimum retirement age of 55,[6] (3) an escalation clause of 2% per year, identical to that of general city employees; and (4) a guaranteed pension after 25 years of service. The pension changes were to be prospective in application with respect to future members while present members would have the option to come under the new program; an option exercisable within a limited deadline period.[7]

In the course of negotiations the City took certain actions to which the DPOA took exception. While the Detroit Labor Relations Bureau, with the support of the mayor, neared agreement with the DPOA in bargaining on the elimination of residency requirements, the Common Council, in separate action, conducted hearings and adopted a new ordinance which required all city employees to reside within the city limits, to which the DPOA expressed strong opposition. The association also opposed modification of police recruitment qualifications mentioned earlier.

Finally, the DPOA took issue with the Common Council's unilateral submission of the mayor's proposed amendments to the Policemen and Firemen

[5] The changes made by the City pertained to the eligibility age, height, education and vision requirements of applicants for employment.

[6] Prior to the proposed changes, the existing system provided that police officers could retire after 25 years of service, regardless of age.

[7] The proposed changes appear in the minutes of the Detroit Common Council for Tuesday, September 3, 1968, pp 2130–2144.

Retirement System charter provision to popular referendum[8] absent meaningful bargaining on pension matters. Moreover, the association objected to the City's insistence on discussing pension matters apart from other items subject to agreement such as promotion, seniority, and job classification.

On July 10, 1968 the DPOA filed a formal unfair labor practice complaint under MCLA 423.210(a) and (e); MSA 17.455(10)(a) and (e) with the State Labor Mediation Board.[9] The DPOA amended its complaint following passage of the retirement system referendum amendment charging the foregoing actions on the part of the City constituted a failure to bargain under PERA. Issue was joined on the following stipulated questions:

"1. Did the City of Detroit have the duty to bargain with the DPOA regarding residency requirements for policemen? If so, did the City of Detroit violate this duty to bargain by enactment of a residency ordinance?

"2. Did the City of Detroit have the duty to bargain with the DPOA regarding recruiting requirements for patrolmen? If so, did the City of Detroit violate this duty by making changes in the existing recruiting requirements?

"3. When an economic item which is the subject of bargaining, has been agreed to by the respective bargaining agents of the City of Detroit and the union, which has been approved by the mayor, does the Common Council's action in deleting said item from the budget constitute a refusal to bargain in good faith?

"4. Under all the facts and circumstances, did the City of Detroit have a duty to bargain at one time on all mandatory subjects of bargaining at the time of the conferences concerning the proposed retirement provisions changes?

"5. Did the City of Detroit bargain in good faith with

[8] The referendum passed November 5, 1968.

[9] Redesignated the Employment Relations Commission by 1969 PA 181, amending MCLA 423.2; MSA 17.454(2).

the DPOA on the subject matter of retirement provision changes?"

Successive hearings were conducted by the MERC trial examiner who decided that the DPOA charges were without merit. Exceptions were filed by the DPOA to the examiner's decision and upon review by the commission a decision and order issued March 18, 1971.

While MERC, in its opinion and order, passed upon all of the five issues set forth herein, only three of them were appealed to this Court—numbers 1, 4 and 5. We treat them *seriatim.*

As to issue 1, MERC ruled there had been no violation of the applicable section of PERA. Subsequent to the time this case was submitted to us, our Supreme Court spoke with finality thereto. See *Detroit Police Officers Association v Detroit,* 385 Mich 519 (1971). We read this opinion to mean that the City is entitled to impose such residency requirement. It did so. Hence, we hold that issue no longer mandatorily negotiable.

Issues 4 and 5 both relate to the pension and retirement system. On issue 4 MERC determined that pension and retirement terms are an essential part of an employee's terms and conditions of employment and thus a mandatory subject for collective bargaining. It further held that the City's insistence "on isolating one mandatory subject of collective bargaining from other unresolved issues constitutes a refusal to bargain under § 10(e) of PERA". This position has been taken by MERC in earlier employment decisions. We do not disagree therewith, except, of course, as to the constitutional guarantee of the contractual nature of pensions already vested and the absolute inviolability thereof. Const 1963, art 9, § 24. To this

extent then we affirm the holding of MERC as to issue 4.

Issue 5 as stated, in our view, does not delineate with precision the important legal question we are called upon to decide. In irreducible simplicity it is whether "Home Rule" city charter provisions which are in conflict with municipal obligations under PERA will prevail over the statute.

For the guidance of other municipalities and public collective bargaining units, we will try to strip that issue to its bare bones. What really happened in this case was that the mayor as the chief executive officer enlisted the aid of a "Task Force Committee on City Finances". He also had an executive staff member functioning as a bargaining representative. Under the charter, however, each or both for that matter, had limited powers because that document reposes final authority to approve "all contracts to which the city or any board or commission thereof" is a party in the Common Council. But even though the mayor, his committee and his executive assistant had advocated changes in the policemen's retirement system and the council by resolution had unanimously approved the recommended changes, there remained a barrier to effective municipal action. In 1941, the Policemen's and Firemen's Retirement System had been made part of the city charter, amendable solely by popular vote. MCLA 117.21; MSA 5.2100. Hence, the mayor, the council and all the king's horses and all the king's men could not change the involved charter provision without approval of the electorate. So the plan advocated by the City was referred by referendum to the electorate. It was approved.

But meanwhile back at the bargaining table, the DPOA was clamorously contending that the refer-

endum was of no legal force. Prospective changes in a pension and retirement system, said DPOA, are mandatory subjects of bargaining under PERA, and this requirement of the statute obtains over the charter provision.

We agree with DPOA. If the course followed by the City in this case were to receive judicial approval, the rights legislatively granted to public employees in return for divesting them of their legal right to strike would become meaningless.

It takes little insight to appreciate what a municipal employer and its electorate could do to the collective bargaining process if this procedure were allowed to stand. Any "Home Rule" city could merely write its pension and retirement system into its charter, and insulate any change therein from negotiations and settlement save with electoral approval. This to us is the exact converse of what the Legislature intended when it inserted bargaining rights for public employees into the statute.

We hold that the City did fail to bargain in good faith as to prospective changes in its retirement and pension system as here involved. We further hold to so do was an unfair labor practice remediable by an order of MERC. If necessary, we will issue an enforcement order compelling the City to bargain in good faith on this issue as required by MERC's decision. PERA prevails over the city charter for, among other reasons, the reason that it is a "general" law of the state. The Home Rule Act itself writes into its grant of powers the exception which pertains here. MCLA 117.36; MSA 5.2116.

"Sec. 36. No provision of any city charter shall conflict with or contravene the provisions of any general law of the state."

To the extent then that the city charter conflicts with PERA, the charter must yield.

Affirmed as delineated herein. No costs—a public question.

All concurred.