DETROIT POLICE OFFICERS ASSOCIATION v CITY OF DETROIT

1. LABOR RELATIONS—COLLECTIVE BARGAINING—GOOD FAITH BAR-
   GAINING.

   The primary obligation placed upon the parties in a collective
   bargaining setting is to meet and confer in good faith; the law
   does not mandate that the parties ultimately reach agreement,
   nor does it dictate the substance of the terms on which parties
   must bargain; in essence the requirements of good faith bar-
   gaining is simply that the parties manifest such an attitude
   and conduct that will be conducive to reaching an agreement.

2. LABOR RELATIONS—COLLECTIVE BARGAINING—GOOD FAITH BAR-
   GAINING—PUBLIC EMPLOYEES RELATIONS ACT—NATIONAL LABOR
   RELATIONS ACT—TERMS AND CONDITIONS OF EMPLOYMENT—
   MANDATORY SUBJECTS OF BARGAINING—PERMISSIVE SUBJECTS OF
   BARGAINING—ILLEGAL SUBJECTS OF BARGAINING.

   The duty to bargain in good faith under a section of the public
   employees relations act and a section of the National Labor
   Relations Act extends to those subjects found within the scope
   of the phrase "wages, hours and other terms and conditions of
   employment"; the subjects included within that phrase are
   referred to as "mandatory subjects" of bargaining and once a

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 48 Am Jur 2d, Labor and Labor Relations §§ 546, 645, 652, 687,
     695–704, 808.
[2] 48 Am Jur 2d, Labor and Labor Relations §§ 658, 814
[3] 48 Am Jur 2d, Labor and Labor Relations §§ 648–650, 809, 1175.
[4] 48 Am Jur 2d, Labor and Labor Relations §§ 899–1130, 1181–1190.
[5, 8–10] 56 Am Jur 2d, Municipal Corporations, Counties, and Other
     Political Subdivisions § 247.
[6] 48 Am Jur 2d, Labor and Labor Relations § 1193.
[7] 48 Am Jur 2d, Labor and Labor Relations § 1201.
[11, 15, 19] 48 Am Jur 2d, Labor and Labor Relations §§ 1220, 1241,
     1272, 1274, 1322.
[12] 48 Am Jur 2d, Labor and Labor Relations §§ 1191, 1193–1197,
     1201, 1202.
[13, 14, 16, 17] 56 Am Jur 2d, Municipal Corporations, Counties, and
     Other Political Subdivisions §§ 131, 132.
[18] 48 Am Jur 2d, Labor and Labor Relations §§ 222, 228, 229, 236.

specific subject has been classified as a mandatory subject of bargaining, the parties are required to bargain concerning the subject if it has been proposed by either party, and neither party may take unilateral action on the subject absent an impasse in the negotiations; the remaining matters not classified as mandatory subjects of bargaining are referred to as either "permissive" or "illegal" subjects of bargaining (29 USC 158; MCLA 423.215).

3. LABOR RELATIONS—COLLECTIVE BARGAINING—MANDATORY SUBJECTS OF BARGAINING—PUBLIC EMPLOYEES RELATIONS ACT—NATIONAL LABOR RELATIONS ACT—CONCESSION.

   After the parties have met in good faith and bargained over the mandatory subjects placed upon the bargaining table they have satisfied their statutory duty; the express wording of a section of the public employment relations act and a section of the National Labor Relations Act make it clear that the obligation to bargain does not compel either party to agree to a proposal or require the making of a concession (29 USC 158; MCLA 423.215).

4. LABOR RELATIONS—UNFAIR LABOR PRACTICES—MICHIGAN EMPLOYMENT RELATIONS COMMISSION—DISCRETION—ORDER TO BARGAIN —APPEAL AND ERROR—COURT OF APPEALS—LEGISLATIVE INTENT.

   The enforcement mechanism of the labor statutes result from the filing by one party of an "unfair labor practices" charge against the other party; if the Michigan Employment Relations Commission finds that the charges are true, it has the discretionary power to issue an order to bargain in good faith on the unresolved issues; the aggrieved party may appeal such an order to the Michigan Court of Appeals or the Michigan Employment Relations Commission may itself petition the Court of Appeals for enforcement of the order to bargain; the result sought by the Legislature in providing this enforcement machinery is to return the parties to the bargaining table to resolve their differences.

5. MUNICIPAL CORPORATIONS—RESIDENCE—ORDINANCES—POLICE.

   The common council of the City of Detroit had the authority to enact a residency ordinance for police officers.

6. LABOR RELATIONS—MUNICIPAL CORPORATIONS—ORDINANCES— TERMS AND CONDITIONS OF EMPLOYMENT—PUBLIC EMPLOYEES RELATIONS ACT—MANDATORY SUBJECTS OF BARGAINING—COLLECTIVE BARGAINING—RESIDENCE—POLICE—CONSTITUTIONAL LAW.

   The enactment of an ordinance, despite its validity and compel-

ling purpose, cannot remove the duty to bargain under the public employees relations act if the subject of the ordinance concerns the "wages, hours or other terms and conditions of employment" of public employees; if the residency ordinance for police officers of the City of Detroit were to be read to remove a mandatory subject of bargaining from the scope of collective bargaining negotiations, the ordinance would be in direct conflict with state law and consequently invalid (Const 1963, art 7, § 22; MCLA 423.201 *et seq.*).

7. LABOR RELATIONS—CONSTITUTIONAL LAW—LEGISLATURE—PUBLIC EMPLOYEES RELATIONS ACT—SUPREME COURT.

A section of an article of the Michigan Constitution vests authority in the Legislature to "enact laws providing for the resolution of disputes concerning public employees"; the public employees relations act is such a law and the Michigan Supreme Court is required to follow the constitutional intent of the Legislature (Const 1963, art 4, § 48; MCLA 423.201 *et seq.*).

8. LABOR RELATIONS—RESIDENCE—RECRUITING REQUIREMENTS—POLICE—EMPLOYMENT STANDARDS—TERMS AND CONDITIONS OF EMPLOYMENT.

A residency requirement, regulating the conduct of police officers throughout their years on the force, may not be labeled a "continuing recruiting requirement"; a recruiting requirement, whether it is age, mental competency, physical characteristics or residency, focuses on that point in time at which a candidate for employment is hired; at that moment the new recruit must meet established standards but once an applicant has met these standards and has been hired as an employee, the "recruiting requirements" as such do not continue to regulate his or her right to hold the job; employment standards are lawful but they must be treated as a term and condition of employment.

9. LABOR RELATIONS—RESIDENCE—POLICE—TERMS AND CONDITIONS OF EMPLOYMENT—PUBLIC EMPLOYEES RELATIONS ACT—MUNICIPAL CORPORATIONS—MANDATORY SUBJECTS OF BARGAINING—COLLECTIVE BARGAINING—ORDINANCES.

The residency requirement for police officers of the City of Detroit is a term and condition of employment as understood in a section of the public employees relations act; residency is a mandatory subject of bargaining under that act and collective bargaining cannot be avoided through the enactment of a city ordinance (MCLA 423.215).

10. LABOR RELATIONS—MUNICIPAL CORPORATIONS—PUBLIC EMPLOYEES RELATIONS ACT—IMPASSE—RESIDENCE—POLICE OFFICERS—ORDINANCES.

A city was free to take unilateral action and adopt a residency ordinance for its police officers where an impasse was reached when the common council rejected the agreement reached between the Detroit Police Officers Association and the Labor Relations Bureau of the City of Detroit regarding the residence of police officers; the city was not in violation of a section of the public employees relations act (MCLA 423.210).

11. LABOR RELATIONS—POLICE RETIREMENT PLANS—MANDATORY SUBJECTS OF BARGAINING.

Changes in a police retirement plan are mandatory subjects of bargaining.

12. LABOR RELATIONS—PUBLIC EMPLOYEES RELATIONS ACT—NATIONAL LABOR RELATIONS ACT—FEDERAL DECISIONS—PRECEDENT—COLLECTIVE BARGAINING.

The Legislature intended the courts to view the Federal labor case law as persuasive precedent in interpreting the public employees relations act because the scope of bargaining under that act is patterned after that found under the National Labor Relations Act (29 USC 158; MCLA 423.201 *et seq.*).

13. STATUTES—HOME RULE CITIES ACT—PUBLIC EMPLOYEES RELATIONS ACT—POLICE RETIREMENT PLANS.

The home rule cities act and the public employees relations act can be reconciled and a purpose found to be served by each; the public employees relations act contemplates open negotiations between the parties unless controlled by a specific state law, the home rule cities act does not require voter approval for changes in the substantive details of a police retirement plan (MCLA 117.1 *et seq.*, 423.201 *et seq.*).

14. MUNICIPAL CORPORATIONS—RETIREMENT PLANS—CHARTERS—HOME RULE CITIES ACT.

Retirement plans are a "permissible charter provision" adoptable under the broad grant of authority found in two sections of the home rule cities act; nowhere in that act is there a reference that the charter contain more than a general grant and outline of authority to a city government to implement and maintain a retirement plan (MCLA 117.1 *et seq.*).

15. MUNICIPAL CORPORATIONS—POLICE RETIREMENT PLANS—CONTRACTS—CHARTERS—COLLECTIVE BARGAINING—PUBLIC EMPLOYEES RELATIONS ACT.

Since the substantive details of a retirement plan for city police

officers may be classified only as contractual or charter provisions, they are subject to the duty to bargain found in the public employees relations act (MCLA 423.201 *et seq.*).

16. MUNICIPAL CORPORATIONS—HOME RULE CITIES ACT—PENSION
    PLANS—PUBLIC EMPLOYEES RELATIONS ACT.

The home rule cities act does not require that the substantive terms of pension plans be voter approved and in this important respect it does not conflict with the public employees relations act (MCLA 117.1 *et seq.*, 423.201 *et seq.*).

17. STATUTES—HOME RULE CITIES ACT—PUBLIC EMPLOYEES RELATIONS
    ACT—CONSTRUCTION—MUNICIPAL CORPORATIONS—PENSION
    PLANS—CHARTERS—COLLECTIVE BARGAINING.

The home rule cities act and the public employees relations act can easily be harmonized by reading the home rule cities act to empower a city to set up the procedures for its pension plan in the charter and to leave the substantive terms of the plan to collective negotiation; therefore, the Michigan Supreme Court construes these two independent acts of the Legislature to be consistent with each other (MCLA 117.1 *et seq.*, 423.201 *et seq.*).

18. PENSIONS—BENEFITS—STATES—POLITICAL SUBDIVISIONS—CONSTI-
    TUTIONAL LAW—COLLECTIVE BARGAINING.

Those already covered by each pension plan of the state and its political subdivisions are assured by a section of an article of the Michigan Constitution that their benefits will not be diminished by future collective bargaining agreements (Const 1963, art 9, § 24).

19. LABOR RELATIONS—MUNICIPAL CORPORATIONS—CHARTERS—COL-
    LECTIVE BARGAINING—POLICE RETIREMENT PLANS—POLICE PEN-
    SION PLANS.

Under a holding of the Michigan Supreme Court and the mandate of the voters of the City of Detroit as expressed in an article of the new City Charter, adopted November 6, 1973, the city will be required to bargain over prospective changes in the police retirement and pension plan (Detroit Charter, art 11).

Appeal from Court of Appeals, Division 1, Bronson, P. J., and V. J. Brennan and O'Hara, JJ., affirming Employment Relations Commission. Submitted September 5, 1973. (No. 13 September Term 1973, Docket Nos. 54,410, 54,411.) Decided February 14, 1974.

41 Mich App 723 affirmed in part and reversed in part.

Complaint by Detroit Police Officers Association against the City of Detroit before the Employment Relations Commission alleging unfair labor practices. Defendant appealed to the Court of Appeals from that part of the Commission's decision and order finding in favor of the plaintiff. Affirmed. Plaintiff and City of Detroit appeal. Michigan Employment Relations Commission cross-appeals. Affirmed in part and reversed in part.

*Winston L. Livingston* (by *J. Douglas Korney*), for Detroit Police Officers Association.

*Michael M. Glusac,* Corporation Counsel, and *Nick Sacorafas, Ronald Zajac* and *Michael A. Hurvitz,* Assistants Corporation Counsel, for the City of Detroit.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Francis W. Edwards,* Assistant Attorney General, for Michigan Employment Relations Commission.

Amicus Curiae: *Rothe, Marston, Mazey, Sachs, O'Connell, Nunn & Freid, P. C.,* for Detroit Fire Fighters Association.

*Goldberg, Previant & Uelemen* (by *John S. Williamson, Jr.*), for Police Officers Association of Michigan and the Michigan Conference of Teamsters.

SWAINSON, J. In 1965, the Legislature passed

1965 PA 379[1] which amended the public employ-
ment relations act (PERA) to allow public em-
ployees[2] to select a collective bargaining represent-
ative and to enter into collective bargaining nego-
tiations with their public employer. Pursuant to
the newly amended PERA the Detroit Police Offi-
cers Association (DPOA) gained recognition as the
exclusive collective bargaining agent for a unit of
Detroit patrolmen and policewomen in January of
1966. Shortly thereafter, extensive collective bar-
gaining negotiations proceeded between the City of
Detroit (City) and the DPOA.

The collective bargaining negotiations continued
until 1968 without resolving several areas of dis-
agreement. The DPOA in July of 1968 filed an
unfair labor practices charge[3] with the Labor Me-
diation Board, later redesignated the Michigan
Employment Relations Commission, (MERC) alleg-
ing that the City had refused to bargain in good
faith on key issues. A hearing was held and MERC
issued a decision and order on March 18, 1971
addressing the issues raised by the DPOA. *City of
Detroit, Police Department,* 6 MERC Lab Op 237
(1971). The conclusions of MERC on the issues
relevant to today's appeal can be summarized as
follows:

1. The adoption of the residency ordinance did
not remove the subject of a residency requirement
for police officers from the arena of collective
bargaining. However, the City did not commit an
unfair labor practice by enacting the residency
ordinance. A valid impasse was reached when the
common council rejected the agreement reached
between the DPOA and the City's bargaining

---

[1] MCLA 423.201 *et seq.;* MSA 17.455(1) *et seq.*

[2] PERA does not apply to those employees in the state classified
civil service.

[3] MCLA 423.210(a) and (e); MSA 17.455(10), (a) and (e).

team. Thereafter, the City was free to take unilateral action.

2. The City is not required to bargain over recruiting requirements for patrolmen. The duty to bargain extends only to those "terms and conditions of employment" that affect employees after they have commenced their employment relationship.

3. The City erroneously refused to bargain on changes in the police retirement plan when it initiated and conducted a voter referendum to amend the City Charter provisions controlling the police retirement plan. MERC ordered, on this issue, "that the City of Detroit shall not require as a condition to any agreement reached regarding retirement provisions for police officers that [such agreement] be approved by a vote of the electorate."

The City appealed that portion of MERC's decision dealing with the residency requirement and pension provisions to the Court of Appeals. *Detroit Police Officers Association v Detroit,* 41 Mich App 723; 200 NW2d 722 (1972). The Court of Appeals reversed MERC on the residency issue interpreting this Court's decision in *Detroit Police Officers Association v Detroit,* 385 Mich 519; 190 NW2d 97 (1971), to hold that because the City could constitutionally impose the residency ordinance it was no longer obligated to bargain with regard to this subject. On the retirement issue, the Court of Appeals agreed with MERC that the duty to bargain under the provisions of PERA concerning retirement plan changes prevailed over any contrary provision in the City Charter.

After the decision of the Court of Appeals was issued, both the DPOA and the City—sought leave to appeal to this Court. Leave was granted, 388

Mich 807 (1972). Phrased in the language of labor law, the parties seek basically to have two questions answered.

1. Does the City of Detroit have the duty under PERA to bargain in good faith with the DPOA regarding residency requirements for police officers? If so, did the City violate its duty to bargain in good faith when it enacted the residency ordinance?

2. Does the City have a duty under PERA to bargain in good faith with the DPOA on the subject of police retirement plan changes where retirement provisions are a part of the City Charter and amendable only by a popular vote of the electorate?

Before turning to consider the specific issues presented, we find it useful to examine in general terms the meaning of the duty to bargain under PERA and especially § 15 (MCLA 423.215; MSA 17.455[15]) thereof.

The legislative parameters of the duty to bargain under PERA are found in § 15, which reads:

"A public employer shall bargain collectively with the representatives of its employees as defined in section 11 and is authorized to make and enter into collective bargaining agreements with such representatives. For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract, ordinance or resolution incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession."

Section 15 of PERA undoubtedly was patterned after § 8(d) of the National Labor Relations Act (NLRA).[4] Both statutes use almost identical language in describing the duty to bargain. The decision by the Michigan Legislature to adopt the language of § 8(d) of the NLRA is significant. Section 8(d) has been a part of the NLRA since the Taft-Hartley amendments of 1947.[5] The terms of § 8(d) have been litigated in numerous cases before the National Labor Relations Board (NLRB) and the Federal courts. Although we cannot state with certainty, it is probably safe to assume that the Michigan Legislature intentionally adopted § 15 PERA in the form that it did with the expectation that MERC and the Michigan courts would rely on the legal precedents developed under NLRA, § 8(d) to the extent that they apply to public sector bargaining. Edwards, *The Emerging Duty to Bargain in the Public Sector,* 71 Mich L Rev 885, 895 (1973).

The primary obligation placed upon the parties in a collective bargaining setting is to meet and confer in good faith. The exact meaning of the duty to bargain in good faith has not been rigidly defined in the case law. Rather, the courts look to the overall conduct of a party to determine if it has actively engaged in the bargaining process

---

[4] Section 8(d) NLRA (61 Stat 142 [1947], 29 USC 158[d]):

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * * ."

[5] Even prior to the adoption of § 8(d) in 1947, the obligation to bargain in good faith had been developed through the Federal case law. *E.g., National Labor Relations Board v Jones & Laughlin Steel Corp,* 301 US 1, 45; 57 S Ct 615; 81 L Ed 893 (1937).

with an open mind and a sincere desire to reach an agreement. *National Labor Relations Board v Montgomery Ward & Co,* 133 F2d 676, 686; 146 ALR 1045 (CA 9, 1943); *National Labor Relations Board v General Electric Co,* 418 F2d 736, 756 (CA 2, 1969); *cert den* 397 US 965 (1970); Morris, Ed, *The Developing Labor Law,* ch 11, (1971). The law does not mandate that the parties ultimately reach agreement, nor does it dictate the substance of the terms on which the parties must bargain. In essence the requirements of good faith bargaining is simply that the parties manifest such an attitude and conduct that will be conducive to reaching an agreement. Edwards, *supra,* 894.

The duty to bargain in good faith under § 15 PERA and § 8(d) NLRA extends to those subjects found within the scope of the phrase "wages, hours and other terms and conditions of employment". In the prevailing language used to interpret the NLRA and adopted by MERC in interpreting § 15 PERA in this case, the subjects included within that phrase are referred to as "mandatory subjects" of bargaining. Once a specific subject has been classified as a mandatory subject of bargaining,[6] the parties are required to bargain concern-

---

[6] The remaining matters not classified as mandatory subjects of bargaining are referred to as either "permissive" or "illegal" subjects of bargaining. A permissive subject of bargaining falls outside of the phrase "wages, hours, and other terms and conditions of employment". An example of a permissive subject would be a desire by one party to include a union label on all products manufactured by the employer. *Kit Manufacturing Co,* 150 NLRB 662; 58 LRRM 1140 (1964), enforced 365 F2d 829 (CA 9, 1966). Since the impact of including the union's label on a product was found by the NLRB to be at best "remote and speculative" to wages, hours, and other terms and conditions of employment, the NLRB would not require the parties to bargain on the subject. The parties, however, may bargain by mutual agreement on a permissive subject, but neither side may insist on bargaining to a point of impasse. *National Labor Relations Board v Wooster Division of Borg-Warner Corp, infra.*

An "illegal" subject of bargaining is a provision, such as a closed shop, that is unlawful under the collective bargaining statute or other

ing the subject if it has been proposed by either party, and neither party may take unilateral action on the subject absent an impasse in the negotiations. See generally, *National Labor Relations Board v Wooster Division of Borg-Warner Corp,* 356 US 342; 78 S Ct 718; 2 L Ed 2d 823 (1958); *Fibreboard Paper Products Corp v National Labor Relations Board,* 379 US 203; 85 S Ct 398; 13 L Ed 2d 233; 6 ALR3d 1130 (1964); *City of Detroit, Police Department,* 6 MERC Lab Op 237 (1971).

In the private sector, such subjects as hourly rates of pay, overtime pay, shift differentials, holiday pay, pensions, no-strike clauses, profit sharing plans, rental of company houses, grievance procedures, sick leave, work-rules, seniority and promotion, compulsory retirement age, and management rights clauses, are examples of mandatory subjects of bargaining. Morris, Ed, *supra,* ch 15. MERC has adopted a similar posture toward mandatory subjects of bargaining. In the proceedings below, MERC found both the residency requirement and the pension provisions fall under the "mandatory" classification. One of our tasks in this opinion will be to review MERC's classification of the residency requirement and retirement plan as mandatory subjects of bargaining.

After the parties have met in good faith and bargained over the mandatory subjects placed upon the bargaining table, they have satisfied their statutory duty. *National Labor Relations Board v American National Insurance Co,* 343 US 395, 404; 72 S Ct 824, 829; 96 L Ed 2d 1027 (1952). The express wording of § 15 PERA and § 8(d) NLRA

applicable statute. "The parties are not explicitly forbidden from discussing matters which are illegal subjects of bargaining, but a contract provision embodying an illegal subject is, * * * unenforceable." Edwards, *supra,* 909.

make it clear that the obligation to bargain does not compel either party to agree to a proposal or require the making of a concession. "Thus, * * * the obligation * * * is simply to bargain in good faith on the items mentioned in the statute [PERA]." *Regents of the University of Michigan v Labor Mediation Board,* 18 Mich App 485; 171 NW2d 477 (1969).

If the parties are not able to agree on the terms of a mandatory subject they are said to have reached an "impasse". Under the NLRA when good faith bargaining has reached an impasse, the employer may take unilateral action on an issue if that action is consistent with the terms of its final offer to the union.[7] The duty to bargain, however, does not terminate. It is merely suspended and again becomes viable with a change in the surrounding conditions or circumstances. Morris, Ed, *supra,* 300–331. The concept of unilateral action after impasse is also recognized in the public sector. The public sector has, however, begun to institute procedures such as fact-finding and arbitration that require the parties to actually negotiate beyond impasse. As Professor Edwards noted in his article on public sector bargaining which we have heretofore cited, these new procedures may in the future foreclose any unilateral actions by public employers. Edwards, *supra,* 924.

The enforcement mechanism of the labor statutes result from the filing by one party of an "unfair labor practices" charge against the other party. In the context of bargaining an unfair practices labor charge might, for example, allege that a party will not meet in good faith to bargain

---

[7] One important distinction between a "mandatory" and a "permissive" subject of bargaining is that a party may take unilateral action on a permissive subject without first entering into the bargaining process.

or that a party refuses to discuss a mandatory subject of bargaining, or, as the DPOA charged herein, that the City has taken unwarranted unilateral action. If the administrative agency (MERC in Michigan) finds that the charges are true, it has the discretionary power to issue an order to bargain in good faith on the unresolved issues. The aggrieved party may appeal such an order to the Court of Appeals; or, MERC may itself petition the Court of Appeals for enforcement of the order to bargain. The result sought by the Legislature in providing this enforcement machinery is to return the parties to the bargaining table to resolve their differences.

It is with this general background in mind that we turn now to consider the first issue—residency requirements—raised in this present case.

## RESIDENCY REQUIREMENT

At the outset of our discussion on this first issue —whether the City has the duty to bargain over the residency requirement for police officers—we wish to clarify our holding in a prior case between these same litigants, *Detroit Police Officers Association v Detroit,* 385 Mich 519; 190 NW2d 97 (1971). Contrary to the opinion expressed by the Court of Appeals, we neither considered nor decided in that case any question concerning the scope of the duty to bargain. The *ratio decidendi* simply was that the common council had the authority to enact a residency ordinance. We reaffirm that holding today.

The common council could very well have had valid goals in mind when it considered and adopted the residency ordinance, and such were alluded in this author's opinion in the prior case:

"The job of a policeman does have 'natural distinguishing characteristics' from all other city employees. There is a special relationship between the community policed and a policeman. A policeman's very presence, whether actually performing a specified duty during assigned hours, or engaged in any other activity during off-duty hours, provides a trained person immediately available for enforcement purposes.

"Policemen are required by department order to be armed at all times, and why is this? Simply because by such requirement they are, no matter where they are or what they are doing, immediately prepared to perform their duties. They are charged with law enforcement in the City of Detroit, and obviously must be physically present to perform their duties. The police force is a semi-military organization subject at all times to immediate mobilization, which distinguishes this type of employment from every other in the classified service." 385 Mich 519, 522–523.

The enactment of an ordinance, however, despite its validity and compelling purpose, cannot remove the duty to bargain under PERA if the subject of the ordinance concerns the "wages, hours or other terms and conditions of employment" of public employees. If the residency ordinance were to be read to remove a mandatory subject of bargaining from the scope of collective bargaining negotiations, the ordinance would be in direct conflict with state law and consequently invalid. Const 1963, art 7, § 22; *Grand Haven v Grocer's Cooperative Dairy Co,* 330 Mich 694, 698; 48 NW2d 362 (1951); *Local Union No 876, International Brotherhood of Electrical Workers v State Labor Mediation Board,* 294 Mich 629; 293 NW 809 (1940). Therefore, if, as we will consider below, residency is a mandatory subject of bargaining, a city ordinance cannot foreclose collective bargaining on the subject.[8]

---

[8] PERA is unlike the law in some other states wherein conditions of

In the proceedings before MERC and the Court of Appeals, the City conceded that the residency requirement fell within the definition of "terms and conditions of employment". On this appeal, however, the City has changed its legal position and now argues that residency is a "continuing recruiting requirement". The effect of this changed position, if accepted by the Court, would be to reclassify residency from a mandatory subject of bargaining to a pre-employment qualification such as age, height, education, or vision over which MERC held that the City was not required to bargain.[9]

The essence of both the City's argument concerning the breadth of its recruiting requirements and our finding that the argument is incorrect may be found in the following excerpts from the

---

employment that are controlled by a valid city ordinance are specifically exempted from the scope of collective bargaining. *Edwards, supra,* 919. Cf., *Wayne County Civil Service Commission v Board of Supervisors,* 384 Mich 363; 184 NW2d 201 (1971). The Legislature in adopting the language of § 8(d) NLRA for § 15 PERA made the judgment that Michigan's public employees should enjoy " * * * many of the rights and kinds of contractual benefits gained by workers in private employment by the collective bargaining process, except as the same would be repugnant to existing laws or an abuse of authority of a public employer; considering the nature of the public service involved and the laws affecting it." *Rayburn v Board of Education of Mt Morris Consolidated School District, No 3,* 71 LRRM 2177–2178 (Genesee Circuit Court, 1969). Article 4, § 48 of the Michigan Constitution of 1963 vests authority in the Legislature to "enact laws providing for the resolution of disputes concerning public employees". PERA is such a law and we as a Court are required to follow the constitutional intent of the Legislature.

The inclusion in MCLA 423.215; MSA 17.455(15) of the option to reduce an oral agreement to "a written contract, *ordinance* or resolution incorporating any agreement reached if requested by either party" (emphasis added) further evidences the legislative intent that city ordinances should reflect the results of the collective bargaining negotiations.

[9] We accept MERC's decision that the City is not required to bargain over recruiting requirements as the law of this case. The general issue of recruiting requirements is not before us on this appeal.

colloquy between this Bench and the attorney for
the City at the oral presentation of this appeal.

"*Mr. Sacorafas [Assistant Corporation Counsel, City
of Detroit]:* First of all, residency has been in existence
—residency requirements—in existence for over 30
years via the police manual and subsequently by the
ordinance.

"Justice T. E. BRENNAN: Is residency a term or condi-
tion of employment?

"*Mr. Sacorafas:* No, Your Honor, we take the position
now—and as we indicated, and we have to admit—that
the lower level in MERC we did stipulate that it was a
condition of employment but now that—after further
reflection—that we felt that it is not a condition of
employment but that it is a recruiting requirement. It
is no different than saying a man has to be 6' 3" in
order to be on the police force.

"Justice SWAINSON: Is that negotiable?

"Justice LEVIN: Does he have to maintain his resi-
dence in order to stay on the police force?

"*Mr. Sacorafas:* That's correct, Your Honor.

       *   *   *

"Justice LEVIN: Well, then it's a continuing condition
of employment.

"*Mr. Sacorafas:* It's a continuing recruiting require-
ment that requires him to—in other words, it's a condi-
tion precedent to employment rather than a condition
subsequent to employment. That's the difference, Your
Honor. I think the difference is that the MERC has
already ruled that recruiting requirements are not
mandatory subjects of bargaining.

"Justice LEVIN: What are your limitations for hiring
policemen—up to what age do you hire them?

"*Mr. Sacorafas:* I should know this, Your Honor. My
last recollection—and I'll stand correction—I believe we
don't hire over age 30 or 31.

"Justice LEVIN: Do you have any policemen on the
force over age 30 or 31?

"*Mr. Sacorafas:* Oh, yes, we do.

"Justice LEVIN: Well, then that is not a continuing recruiting requirement."

We are not persuaded that the residency requirement, regulating as it does the conduct of police officers throughout their years on the force, may be correctly labeled a "continuing recruiting requirement". In addition, we expressly reject the City's argument that any term or condition of employment may be so labeled. A recruiting requirement, whether it is age, mental competency, physical characteristics or residency, focuses on that point in time at which a candidate for employment is hired. At that moment the new recruit must meet established standards. Once an applicant has met these standards and has been hired as an employee, the "recruiting requirements" as such do not continue to regulate his or her right to hold the job. Employment standards are, of course, lawful, but they must be treated as a term and condition of employment.

Moreover, it is our conclusion that residency in the context of this case is not a recruiting requirement at all. Although the City contends that residency is a recruiting requirement, it allows new officers one year from their date of employment to establish residency in the City of Detroit. The residency requirement is a condition imposed by the City that police officers must comply with in order to maintain their already acquired employment. We accordingly affirm the decision of MERC and the stipulation below by the City that the residency requirement is a term and condition of employment as understood in § 15 PERA. Residency is a mandatory subject of bargaining under PERA and collective bargaining cannot be avoided through the enactment of a city ordinance.

Having decided that the residency requirement

is a mandatory subject of bargaining, we must consider if the City committed an unfair labor practice in 1968 by enacting the residency ordinance. To state our conclusion first, we affirm the decision of MERC which is summarized in the following paragraph from its opinion.

"We [MERC] concur with the Trial Examiner that the City was not in violation of Section 10(e) of PERA. An impasse was reached when the Common Council rejected the agreement reached between the Charging Party [DPOA] and the Labor Relations Bureau [of the City of Detroit] regarding the residence of police officers. At this juncture, the City was free to take unilateral action. It chose to do so by the adoption of the residency ordinance."

MERC correctly found that the City and the DPOA had engaged in good faith bargaining on the residency issue prior to the rejection of the proposed agreement of the common council.[10] Under the prevailing interpretation of PERA, *Detroit Fire Commissioners,* 5 MERC L Op 953, 957 (1970), the common council was not obligated to directly bargain with the DPOA, and therefore, an impasse situation ensued when the previously negotiated

[10] A summary of the bargaining history and proposed agreement between the DPOA and the Labor Relations Bureau of the City of Detroit prior to its rejection by the common council was stated in the opinion of the MERC trial examiner in this matter.

"Relative to the residency requirement of policemen the record establishes that for 30 years the Detroit Police Manual has provided that all members of the department shall reside within the city limits. The panel [fact-finding] recommendations on unresolved economic and other issues issued on February 27, 1968, treated the matter of the residency requirement. It was the recommendation of the panel that the D.P.O.A. request that the residency requirement be dropped, was not unreasonable. Subsequent thereto, during March or April, the City of Detroit's Labor Relations Bureau and the Mayor of the City through the Controller agreed that the residency requirements should be modified in a manner which would leave residency up to the discretion of the Police Commissioner."

agreement was rejected.[11] Unilateral action—the adoption of the residency ordinance—was thereafter permissible. Ultimately § 15 of PERA does not require agreement between the parties. In future negotiations, however, the City will again be required to bargain in good faith on the residency requirement if it is proposed as a bargaining issue by the DPOA. See pages 55–57, *supra*.

## POLICE RETIREMENT PROVISIONS

The second issue raises problems distinct from those encountered in our analysis of the first issue. We summarily find that MERC was correct in holding that changes in the police retirement plan are mandatory subjects of bargaining. Our primary inquiry, then, must be to determine if the incorporation of the retirement provisions into the City Charter obviates the duty under PERA to bargain in good faith over a mandatory subject of bargaining. Secondarily, we must determine if the City committed an unfair labor practice in 1968 by unilaterally submitting a retirement plan amendment to the electorate and thereby foreclosing bargaining.

To briefly answer the City's argument that retirement provisions are not a mandatory subject of bargaining, we cite the leading Federal case of *Inland Steel Co v NLRB,* 77 NLRB 1; 21 LRRM 1310, enforced 170 F2d 247 (CA 7, 1948), *cert den,* 336 US 960 (1949), which has firmly established that pension and retirement provisions are mandatory subjects of bargaining under the NLRA. We

[11] For alternative solutions to the problems created by a legislative body's rejection of a negotiated agreement *see generally,* Blair, *State Legislative Control over the Conditions of Public Employment: Defining the Scope of Collective Bargaining for State and Municipal Employees,* 26 Vand L Rev 1 (1973).

see no reason to deviate from this well-reasoned and long-established Federal precedent in interpreting PERA. As we have discussed above, the scope of bargaining under PERA is patterned after that found under the NLRA. Consequently, we deem that the Legislature intended the courts to view the Federal labor case law as persuasive precedent.

Turning to our primary inquiry in this second issue, we are confronted with what was accurately described in *Wayne County Civil Service Commission v Board of Supervisors,* 384 Mich 363, 367; 184 NW2d 201 (1971), as "that most difficult of all appellate problems; the ascertainment of legislative intent where there is no evidentiary or other reasonably authoritative guide to pertinent meaning or purpose of the legislators." On the one hand the Legislature has adopted PERA which, as we have explained above, foreseeably placed retirement plan issues on the collective bargaining table. On the other hand, it has allowed cities under the home rule cities act[12] to incorporate the substance of their retirement plans into their city charters and to make those plans amendable only by a popular vote.

A statutory conflict would result if we were to accept the arguments of all parties to this appeal. The City argues that its present retirement plan was placed in the City Charter pursuant to the authority of MCLA 117.4(i), 117.4(j); MSA 5.2082, 5.2083, of the home rule cities act; furthermore, that under the act the City may not change any aspect of the retirement plan without first seeking voter approval. The DPOA and MERC argue that §§ 11 and 15 of PERA require uninhibited collective bargaining between the employees' representa-

---

[12] MCLA 117.1 *et seq.;* MSA 5.2071 *et seq.*

tive and the public employer; and, if voter approval is required to effect a change in a mandatory subject of bargaining, the collective bargaining process would be impeded. If the positions of all parties were accepted, we would face direct conflict between that which the City contends the Legislature intended under the home rule cities act and that which MERC and the DPOA contend that the Legislature intended under PERA and we would be required to determine which state statute should prevail and which would be impliedly repealed.

After closely examining the statutes, however, we find that no such conflict in state law is present and that the statutes can be reconciled and a purpose found to be served by each.[13] While we

---

[13] Our guiding principles of construction were precisely stated in *People v Buckley,* 302 Mich 12, 22; 4 NW2d 448 (1942):

"The law does not favor repeals by implication, *In re Opening of Gallagher Avenue,* 300 Mich. 309 [1 NW2d 553 (1942)]; *Sambor v. Home Owners' Loan Corp.,* 283 Mich. 529 [278 NW 674 (1938)]; *In re Reynolds' Estate,* 274 Mich. 354 [264 NW 399 (1936)]; *Club Holding Co. v. Flint Citizens Loan & Investment Co.,* 272 Mich. 66 [261 NW 133 (1935)]. There is no presumption of repeal by implication, *In re Opening of Gallagher Avenue, supra; City of Detroit v. Weil,* 180 Mich. 593 [147 NW 550 (1914)]; *In re Bushey,* 105 Mich. 64 [62 NW 1036 (1895)]; *People v. Thompson,* 161 Mich. 391 [126 NW 466 (1910)]. Repeal by implication is not permitted if it can be avoided by any reasonable construction of the statutes. *Couvelis v. Michigan Bell Telephone Co.,* 281 Mich. 223 [274 NW 771 (1937)]; *People v. Hanrahan,* 75 Mich. 611 (4 L.R.A. 751) [42 NW 1124 (1889)]. If by any reasonable construction two statutes can be reconciled and a purpose found to be served by each, both must stand, *Garfield Township v. A. B. Klise Lumber Co.,* 219 Mich. 31 [188 NW 459 (1922)]; *Edwards v. Auditor General,* 161 Mich. 639 [126 NW 853 (1910)]; *People v. Harrison,* 194 Mich. 363 [160 NW 623 (1916)]. The duty of the courts is to reconcile statutes if possible and to enforce them, *Board of Control of the Michigan State Prison v. Auditor General,* 197 Mich. 377 [163 NW 921 (1917)]. The courts will regard all statutes on the same general subject as part of one system and later statutes should be construed as supplementary to those preceding them, *Wayne County v. Auditor General,* 250 Mich. 227 [229 NW 911 (1930)]. See, also, *Rathbun v. State of Michigan,* 284 Mich. 521 [280 NW 35 (1938)]."

*See also, Valentine v Redford Twp Supervisor,* 371 Mich 138, 144; 123

agree with the DPOA and MERC that PERA contemplates open negotiations between the parties unless controlled by a specific state law, we disagree with the contentions of the City that the home rule cities act requires voter approval for changes in the substantive details of the retirement plan.

The home rule cities act was originally enacted in 1909 (PA 279) under authority of the Constitution of 1908. The act has been modified by various amendments over the years, but it has continued to reflect the position now expressed in Const 1963, art 7, § 22 that Michigan is a strong home rule state with basic local authority. The home rule cities act itself appropriately contains very little substance that the cities must include in their governing document—the city charter. In essential part the act is enabling legislation that permits the cities to mold local government to the needs of the local populus.

Retirement plans are a "permissible charter provision"[14] adoptable under the broad grant of authority found in MCLA 117.4(i) and 117.4(j); MSA 5.2082 and 5.2083 of the home rule cities act. Nowhere in the home rule cities act is there a requirement that the charter contain more than a general grant and outline of authority to a city government to implement and maintain a retirement plan. When the City placed the complete

---

NW2d 227 (1963); *Wayne County Prosecuting Attorney v Wayne County Board of Commissioners,* 44 Mich App 144, 157; 205 NW2d 27 (1972); *Washtenaw County Road Commissioners v Public Service Commission,* 349 Mich 663; 85 NW2d 134 (1957); *Jackson v Michigan Corrections Commission,* 313 Mich 352, 357; 21 NW2d 159 (1946).

[14] Permissible charter provisions are simply those subjects that a city may, if it desires, include in its charter. Permissible charter provisions are distinguished from "mandatory charter provisions" such as the requirement found in MCLA 117.3(d); MSA 5.2073(d) which requires that each city provide in its charter for "the qualifications, duties and compensation of its officers."

detail of its police retirement plan into the City
Charter it went beyond the requirement of state
law as set forth in the home rule cities act.

The distinction between incorporating the gen-
eral outline of the retirement plan and incorporat-
ing the total detail of such a plan into the City
Charter controls our present analysis. The home
rule cities act, a state law, requires only that the
charter grant to the city government the authority
to institute and maintain a retirement plan. The
substantive details of a retirement plan, such as
those now a part of the Detroit City Charter, are
contractual and charter provisions only and do not
rise to the stature of a state law requirement as
the City would have us hold. Accordingly, since
the substantive details of the retirement plan may
be classified only as contractual or charter provi-
sions, they are subject to the duty to bargain found
in PERA—a state law. Such an outcome comports
with MCLA 117.36; MSA 5.2116 of the home rule
cities act which states:

"No provision of any city charter shall conflict with
or contravene the provisions of any general law of the
state."

See also, *Geftos v Lincoln Park*, 39 Mich App 644,
654; 198 NW2d 169 (1972); *Local Union No 876,
International Brotherhood of Electrical Workers v
State Labor Mediation Board, supra.*

To summarize, the home rule cities act does not
require that the substantive terms of pension
plans be voter approved. In this important respect
it does not conflict with PERA. The home rule
cities act and PERA can be easily harmonized by
reading the home rule cities act to empower a city
to set up the procedures for its pension plan in the
charter and to leave the substantive terms of the

plan to collective negotiation. We therefore follow the most basic tenet of statutory construction and construe these two independent acts of the Legislature to be consistent with each other.

This statutory analysis fits well with the will of the voters of the City of Detroit as expressed through their adoption of a new City Charter on November 6, 1973 to become effective July 1, 1974. Under Article 11 of the new City Charter only the broad outline of the "retirement plan" is included in the charter with the substantive terms and changes in the plan left to city ordinance. We quote in part from Article 11:

> "11-101(1) The city shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.
>
> \*     \*     \*
>
> "11-102 The retirement plans of the City existing when this charter takes effect, including the existing governing bodies for administering the plan, the benefit schedules for those plans, and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before until changed by ordinance in accordance with this article."

This change in the method for dealing with police retirement plans is more than coincidental. The commentary accompanying Article 11 expresses the view that this more flexible system of retirement plan change was proposed to meet the requirements of collective bargaining. We quote:

> "The detail contained in chapters 5, 6 and 7 of title 9 of the present charter, dealing with the City's retirement systems, has been eliminated from the new charter.
>
> "The security of City employees' accrued rights and benefits is in no way dependent upon detailed language

in the charter. The employees' best protection is article 9, section 24 of the 1963 Michigan constitution * * * .

"Thus, the new charter, despite the great reduction in the number of words used, makes no change in the existing rights of active and retired City employees. It does, however, permit the benefit schedules of retirement plans to be changed by ordinance, thereby creating a more flexible system for implementing any agreement concerning retirement benefits resulting from the City's legal obligation to bargain collectively with its employees."

The Detroit electorate, in effect, adopted the new City Charter with the intention of facilitating the collective bargaining process.

Before leaving this portion of the retirement issues, we desire to comment upon Const 1963, art 9, § 24 which states in part:

"The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof and shall not be diminished or impaired thereby.

"Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

With this paramount law of the state as a protection, those already covered by a pension plan are assured that their benefits will not be diminished by future collective bargaining agreements.

Although we agree with MERC that the City had the duty to bargain over changes in the police retirement plan, we will not grant enforcement of the MERC order to bargain. See p 51, *supra.* Prior to today's opinion there has been no clear statement by this Court regarding the scope of the duty to bargain under PERA. Under today's holding and the mandate of the City's voters as expressed

in Article 11 of the new City Charter, the City will be required to bargain over prospective changes in the police retirement and pension plan. We find this to be an equitable result.

The Court of Appeals is affirmed in part and reversed in part.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH, WILLIAMS, LEVIN, and M. S. COLEMAN, JJ., concurred with SWAINSON, J.

J. W. FITZGERALD, J., did not sit in this case.