MACOMB COUNTY v AFSCME COUNCIL 25 LOCALS 411 AND 893

Docket No. 296416. Submitted May 10, 2011, at Lansing. Decided
    September 20, 2011, at 9:05 a.m. Leave to appeal granted, 491
    Mich 915.

    AFSCME Council 25 Locals 411 and 893, the International Union
    UAW Locals 412 and 889, and the Michigan Nurses Association
    filed an unfair labor practice with the Michigan Employment
    Relations Commission (MERC) against Macomb County, the Ma-
    comb County Road Commission, and the Macomb Circuit Court,
    alleging that respondents had lowered their pension benefits
    without bargaining on the issue as required by the public employ-
    ment relations act (PERA), MCL 423.201 *et seq.* The parties'
    respective collective-bargaining agreements (CBAs) provided em-
    ployees with various pension plan options, including one in which
    payments terminated at the death of the employee (straight-life
    pension) and another in which pension benefits continued until
    the death of both the employee and his or her spouse (joint-and-
    survivor pension). A Macomb County retirement ordinance man-
    dated that the optional joint-and-survivor benefit be the actuarial
    equivalent of the standard straight-life benefit. A 100 percent
    female/zero percent male blended mortality table was used to
    calculate the joint-and-survivor monthly pension benefits from
    1982 through 2006, when respondents adopted a different mortal-
    ity table for calculating those benefits after determining that use
    of the 100 percent female table resulted in higher pension benefits
    for those employees who chose the joint-and-survivor pension
    option. The monthly joint-and-survivor pension benefit was re-
    duced under the new mortality table. The hearing referee deter-
    mined that under PERA, respondents had a duty to bargain over
    the method by which the joint-and-survivor pension benefits were
    determined even though the pension plan was administered by an
    independent board. She further concluded that respondents' duty
    to bargain had been satisfied because the CBAs fully covered the
    issue of retirement benefit calculations and that although the
    meaning of the term "actuarially equivalent" in the CBAs and the
    ordinance was ambiguous, respondents' unilateral change in the
    benefits paid under the joint-and-survivor pension plan did not
    constitute an unfair labor practice. The MERC reversed, conclud-
    ing that the term "actuarially equivalent" in the CBAs was

ambiguous and as such did not contain the parties' entire agreement with respect to pension benefits. It found that the use of the 100 percent female mortality table over a 24-year period constituted a tacit agreement that the practice would continue and that respondents' unilateral change in the mortality table used to calculate pension benefits constituted an unfair labor practice. Respondents appealed.

The Court of Appeals *held*:

1. A public employer has a duty to bargain in good faith over the wages, hours, and other terms and conditions of employment, MCL 423.215(1). Under MCL 423.210(1)(e), a public employer commits an unfair labor practice when it refuses to bargain in good faith regarding a mandatory subject of collective bargaining or takes unilateral action on the subject absent an impasse in negotiations. A public employer also commits an unfair labor practice if, before bargaining, it unilaterally alters or modifies a term or condition of employment unless the employer has fulfilled its statutory obligation or been freed from it. An employer may not remove a subject of mandatory bargaining from PERA's requirements by assigning its management to a body not controlled by PERA. Retirement or pension benefits and the methods of calculating them are mandatory subjects of collective bargaining. The MERC correctly determined that even though the retirement ordinance granted the Macomb County Retirement Commission the authority to adopt the actuarial assumptions used to calculate retirement benefits, the actuarial assumptions used to calculate the optional forms of pension-benefit payments under the terms of the CBAs were subject to mandatory bargaining under PERA.

2. When a term in a CBA is unambiguous, a past practice may constitute a term or condition of employment only if it is so widely acknowledged and mutually accepted that it amends the contract, that is, if the parties had a meeting of the minds with respect to the new terms or conditions so that there was an agreement to modify the contract. If the term is ambiguous, then a tacit agreement that a past practice will continue renders that practice a term or condition of employment that cannot be unilaterally altered. The phrase "actuarial equivalence" was not defined in the CBAs, and MERC properly determined it was ambiguous. Expert testimony established that "actuarial equivalence" did not unequivocally mean "equal in value." The past practice of accepting the specific mortality table for calculation of joint-and-survivor pensions constituted a tacit agreement with respect to the application of the term "actuarial equivalence" as used in the CBAs that could not be unilaterally altered. The MERC's findings were supported by

competent, material, and substantial evidence on the whole record. Moreover, the retirement commission adopted the use of the 100 percent female mortality table with knowledge that its use would increase costs. Even if "actuarial equivalence" unambiguously meant "equal in value," the parties' practices over a 24-year period modified the contract and could not be unilaterally altered.

Affirmed.

MARKEY, P.J., dissenting, would have held that the retirement commission did not commit an unfair labor practice when it adopted a new mortality table for calculating pension benefits that resulted in a reduction in monthly benefits to those employees who had chosen the joint-and-survivor pension plan. The matter was not subject to mandatory bargaining under PERA. Judge MARKEY concluded that even though not defined in the statute, retirement ordinance, or the CBAs, the term "actuarial equivalent" was not ambiguous. Rather, the term could be defined by looking at dictionary terms and meant that the optional joint-and-survivor pension benefits must be equal in value to the straight-life benefit on the basis of mortality statistical data. Using the 100 percent female mortality table from 1982 through 2006 erroneously resulted in the optional joint-and-survivor pension monthly benefit being more valuable than the straight-life benefit, which was contrary to the plain terms of the CBAs and the retirement ordinance and resulted in more benefits being paid for by the retirement system than provided in the CBAs. This discrepancy in value violated MCL 46.12a(1)(b), which relates to county pension plans and requires uniformity in pension benefits for all persons in the same general class or classification. Accordingly, Judge MARKEY would have held that respondents did not violate MCL 423.210(1)(e) and that the unfair labor practice charges should have been dismissed. Judge MARKEY further concluded that respondents satisfied their duty to bargain in good faith because the retirement benefits and the methods used to calculate them were covered by the parties' CBAs. She disagreed that there was sufficient evidence to find that the parties amended their CBAs by the past practice of using the 100 percent female mortality table to calculate the straight-life and optional joint-and-survivor pension benefits. Respondents' longtime overpayment of optional joint-and-survivor monthly pension benefits that were not the actuarial equivalent of straight-life pensions did not overcome the express language of the CBAs, and the retirement ordinance vested authority in the commission to adopt mortality tables and rates of interest necessary on an actuarial basis.

1. LABOR RELATIONS — PUBLIC EMPLOYEES — COLLECTIVE BARGAINING — MANDATORY SUBJECTS OF BARGAINING — UNFAIR LABOR PRACTICES.

A public employer has a duty under the public employment relations act (PERA) to bargain in good faith over the wages, hours, and other terms and conditions of employment; a public employer commits an unfair labor practice when it refuses to bargain in good faith regarding a mandatory subject of collective bargaining, takes unilateral action on the subject absent an impasse in negotiations, or before bargaining unilaterally alters or modifies a term or condition of employment unless the employer has fulfilled its statutory obligation or been freed from it; an employer may not remove a subject of mandatory bargaining from the requirements of PERA by assigning its management to a body not controlled by PERA (MCL 423.10[1][e], 423.215[1]).

2. LABOR RELATIONS — COLLECTIVE BARGAINING — MANDATORY SUBJECTS OF BARGAINING — RETIREMENT AND PENSION BENEFITS.

Retirement or pension benefits and the methods of calculating them are mandatory subjects of collective bargaining.

3. LABOR RELATIONS — COLLECTIVE BARGAINING — PAST PRACTICES — AMENDMENTS OF CONTRACT.

When a term in a collective-bargaining agreement is unambiguous, a past practice may constitute a term or condition of employment only if it is so widely acknowledged and mutually accepted that it amends the contract, that is, that the parties had a meeting of the minds with respect to the new term or condition so that there was an agreement to modify the contract; if the term is unambiguous, a tacit agreement that a past practice will continue renders that practice a term or condition of employment that cannot be unilaterally altered.

*McConaghy & Nyovich, P.L.L.C.* (by *Timothy K. McConaghy*), for Macomb County, the Macomb County Road Commission, and the Macomb Circuit Court.

*Miller Cohen, P.L.C.* (by *Bruce A. Miller* and *Richard G. Mack, Jr.*), for AFSCME Council 25 Locals 411 and 893.

*Georgi-Ann Bargamian* for International Union UAW Locals 412 and 889.

*Anita Szczepanski* and *Lisa Harrison* for the Michigan Nurses Association.

Before: MARKEY, P.J., and FITZGERALD and SHAPIRO, JJ.

SHAPIRO, J. Respondents-appellants employ members of the charging party-appellee labor unions. Pursuant to their respective collective-bargaining agreements (CBAs), respondents provide pension benefits to their employees. The CBAs provide the employees with various pension plan options, including one in which payments terminate at the death of the employee (straight-life pension) and another in which pension benefits continue until the death of both the employee and his or her spouse (joint-and-survivor pension or optional benefits plan). Since 1982, a particular mortality table was used to calculate the joint-and-survivor-pension monthly benefit. In 2006, respondents adopted a different mortality table for calculating those benefits, thereby reducing the monthly pension benefit paid under the joint-and-survivor plan. The charging parties filed a claim with the Michigan Employment Relations Commission (MERC), asserting that respondents committed an unfair labor practice (ULP) by lowering pension benefits without bargaining on the issue as required by the public employment relations act (PERA), MCL 423.201 *et seq.* The MERC agreed that respondents' unilateral actions constituted a ULP, ordered respondents to bargain on the issue, and held that until an agreement is reached, the joint-and-survivor pension benefits must be calculated under the mortality table adopted in 1982. We affirm.

## I. UNDERLYING FACTS

The Macomb County Employees' Retirement System Ordinance (the retirement ordinance) provides pension

benefits for employees who are members of the system.[1] Before 1982, calculation of optional joint-and-survivor pension benefits included consideration of the gender of the retiree because the average lifespans of women and men differed. In 1978, the United States Supreme Court held that the usage of separate tables constituted unlawful gender discrimination. *Los Angeles Dept of Water & Power v Manhart*, 435 US 702; 98 S Ct 1370; 55 L Ed 2d 657 (1978). The Michigan Attorney General then issued an opinion that public pension systems must adopt gender-neutral mortality tables. OAG, 1981-1982, No 5846, p 29 (January 22, 1981) ("[A]doption of a sexually-neutral retirement table by the [county] would comport with federal and state law.").[2]

In 1982, in response to this change in the law, the Macomb County Retirement Commission asked its actuary, Gabriel, Roeder and Smith (GRS), to study the effect on the retirement system if it adopted a single mortality table for all future retirees based on a blending of male and female mortality tables into one gender-neutral, or unisex, table. GRS's report explained that doing so would result in a range of outcomes. To the degree that the blend was weighted toward male mortality rates, the result would be "substantially lower benefits than at present for women electing a joint and survivor benefit[.]"[3] To the degree that the blend was weighted toward female rates, it would result in an increase in costs because it would increase benefits to male retirees greater than the reduction in benefits to female retirees. The report went on to note that the

---

[1] This includes employees who are not represented by the unions.

[2] The opinion also included a discussion of "actuarially equivalent," although in a different context than at issue here, but noted that the term was undefined.

[3] This would also result in slightly higher benefits being paid to men than had been paid to that date.

only way to "make sure that no participant will receive a lesser benefit than under present procedures" was to adopt a gender-neutral table with a 100% female/0% male blend of mortality rates. The report outlined the specific additional costs to the system using this and several other blends of the male and female mortality tables and offered them as options to the retirement commission. Though cognizant of the increase in overall costs to the retirement system, the retirement commission adopted the 100% female/0% male mortality blend as its gender-neutral mortality table.

The 1982 GRS report also noted that the retirement ordinance required that the optional joint-and-survivor benefit be "the actuarial equivalent" of the standard straight-life benefit. Accordingly, the report recommended adopting a specific rule to govern the meaning of actuarial equivalence in the context of optional benefits. The report recommended adoption of a rule stating that "for purposes of determining amounts of optional benefits, the actuarial equivalent will be based upon a stipulated interest rate and unisex mortality table." Section 15 of the retirement ordinance was thereafter amended to read:

> The Retirement Commission shall from time to time adopt such mortality and other tables of experience, and a rate or rates of regular interest, as are necessary in the Retirement System on an actuarial basis. *For purposes of determining actuarial equivalent Retirement Allowances,* the Retirement Commission is currently using a 7½% interest rate and a blending of male and female rates based on the 1971 group annuity mortality table projected to 1984 with ages set back 2 years . . . . [Emphasis added.]

The retirement commission continued to use the same mortality table for 24 years. However, in 2006, in response to another study conducted by GRS, the retirement commission adopted a new gender-neutral

mortality table, effective July 1, 2007, which, among other things, changed the assumed ratio of retirees selecting the joint-and-survivor plan from 100% female/0% male to 60% male/40% female. This had the result of lowering the monthly retirement benefit for those under the joint-and-survivor pension. The charging parties demanded bargaining over the change. Respondents rejected the demand, and the charging parties filed ULP charges with the MERC asserting a violation of respondents' duty under § 10(1)(e) of PERA, MCL 423.210(1)(e), to bargain over benefits.

Although the hearing referee and the MERC reached different rulings, they agreed on two preliminary questions. First, that under PERA, respondents have a duty to bargain over the method by which the joint-and-survivor pension benefits are determined. Second, they agreed that this duty to bargain was not eliminated by the fact that the pension plan is administered by an independent board.

The hearing referee and the MERC disagreed about whether the CBAs fully covered the issue of retirement-benefit calculations so as to satisfy the respondents' duty to bargain. The hearing referee found that this did because the CBAs incorporated § 26 of the ordinance, which describes the optional joint-and-survivor benefits as "actuarially equivalent" to the straight-life benefits. The hearing referee found that the term "actuarially equivalent" represented a bargained benefit and that, although the meaning of the term "actuarially equivalent" as used by the parties was ambiguous, respondents' unilateral change in the benefits paid under the optional joint-and-survivor plan did not give rise to a ULP.[4]

---

[4] The hearing referee apparently concluded that this ambiguity in contract language could be resolved through grievance arbitration and

The MERC concluded that because the term "actuarially equivalent," as used in the CBAs, was ambiguous, the CBAs did not "contain the entirety of the parties' agreements with respect to pension benefits." It went on to conclude that the 24-year practice of using the 100 percent female mortality table constituted a "tacit agreement that the practice would continue."[5] It found, therefore, that the unilateral change in the mortality tables used to calculate benefits constituted a ULP.

## II. STANDARD OF REVIEW

The MERC's findings of fact are conclusive if supported by competent, material, and substantial evidence on the record considered as a whole. MCL 423.216(e); Const 1963, art 6, § 28; *Amalgamated Transit Union, Local 1564, AFL-CIO v Southeastern Mich Transp Auth*, 437 Mich 441, 450; 473 NW2d 249 (1991). Indeed, appellate review of those findings must be undertaken with sensitivity because of the administrative expertise of the MERC. *Amalgamated Transit*, 437 Mich at 450; *Gogebic Community College Mich Ed Support Personnel Ass'n v Gogebic Community College*, 246 Mich App 342; 348-349; 632 NW2d 517 (2001). The

that, therefore, a unilateral change in optional retirement benefits did not give rise to a ULP. However, even if the hearing referee was correct that the matter could give rise to a grievance, this would not eliminate the presence of a ULP under PERA. In *Bay City Sch Dist v Bay City Ed Ass'n, Inc*, 425 Mich 426, 436-437; 390 NW2d 159 (1986), our Supreme Court held that "[w]here a controversy gives rise to both contractual and statutory claims . . . , grievants have been allowed to pursue different avenues of relief in different fora." If contractual and statutory claims arise out of the same controversy, parallel proceedings are permitted. *Id.* at 437-440.

[5] The hearing referee did not address whether the use of a particular mortality table for 24 years represented a past practice rising to the level of a term or condition of employment.

MERC's legal rulings, however, are not accorded the same deference as its factual findings. "Legal rulings of an administrative agency are set aside if they are in violation of the constitution or a statute, or affected by a substantial and material error of law." *Amalgamated Transit Union*, 437 Mich at 450. Of course, whether an error of law has occurred and, if so, whether it is substantial and material are legal questions subject to review de novo. *Mich Ed Ass'n v Christian Bros Institute of Mich*, 267 Mich App 660, 663; 706 NW2d 423 (2005). Also subject to review de novo are issues of statutory interpretation, *Kent Co Deputy Sheriffs Ass'n v Kent Co Sheriff*, 463 Mich 353, 357 n 8; 616 NW2d 677 (2000), as well as whether contract language is ambiguous and the meaning of unambiguous contract language, *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309, 323; 550 NW2d 228 (1996).

### III. ANALYSIS

In this appeal, we must determine whether respondents violated their duty to bargain when they adopted new mortality tables to calculate joint-and-survivor benefits under the CBAs that had the result of reducing the monthly benefits paid under the joint-and-survivor plan. A public employer commits an unfair labor practice if it refuses to bargain in good faith regarding a mandatory subject of collective bargaining or takes unilateral action on the subject absent an impasse in the negotiations. MCL 423.210(1)(e); *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55; 214 NW2d 803 (1974). A public employer also "commits an unfair labor practice if, before bargaining, it unilaterally alters or modifies a term or condition of employment, unless the employer has fulfilled its statutory obligation or has been freed from it." *Port Huron*, 452 Mich at 317.

### A. MANDATORY BARGAINING

Under § 15 of PERA, MCL 423.215(1), a public employer has a duty to bargain in good faith over subjects found within the scope of the phrase "wages, hours, and other terms and conditions of employment." See *Detroit Police Officers Ass'n*, 391 Mich at 54. The duty to bargain in good faith also extends to officers and agents of public employers. MCL 423.210(1).

Respondents assert that they have no duty to bargain over actuarial assumptions because actuarial assumptions are the sole fiduciary responsibility of the retirement commission. Although actuarial assumptions used to determine whether the retirement system is receiving sufficient contributions to maintain adequate funding may not be a subject of bargaining, *Bd of Trustees of the Policemen and Firemen Retirement Sys of Detroit v Detroit*, 270 Mich App 74, 82-85; 714 NW2d 658 (2006), the purpose of those assumptions is wholly different from those used to calculate joint-and-survivor pension benefits, which, as the hearing referee concluded, are subject to mandatory bargaining:

> [T]he mortality table at issue here, although an "actuarial assumption," is used to calculate the benefits received by retirees from the system. While Respondents' contributions are affected by the choice of the mortality table used for this purpose, they are also affected by the methods used to calculate final average compensation. In general, if benefits rise, so must Respondents' contributions. I find that like the methods used to calculate final average compensation, the mortality table used to calculate joint and survivor pension benefits is a matter properly within Respondents' control and is a mandatory subject of bargaining under PERA.

It is well settled that " '[a]n employer is responsible for its bargaining obligations regardless of whatever

actions are taken by an independent pension board.' "
*Detroit Police Officers Ass'n v Detroit*, 212 Mich App
383, 390; 538 NW2d 37 (1995), aff'd 452 Mich 339
(1996) (citation omitted). Moreover, "[i]t is improper for
an employer to remove a subject of mandatory bargain-
ing from the scope of PERA by assigning its manage-
ment to a body insulated from PERA." *Detroit Police
Officers Ass'n*, 212 Mich App at 389. Our Supreme
Court explained that the basis for this principle origi-
nates from the supremacy of state law over local ordi-
nances:

> The enactment of an ordinance, however, despite its
> validity and compelling purpose, cannot remove the duty to
> bargain under PERA if the subject of the ordinance con-
> cerns the "wages, hours or other terms and conditions of
> employment" of public employees. If the [relevant] ordi-
> nance were to be read to remove a mandatory subject of
> bargaining from the scope of collective bargaining negotia-
> tions, the ordinance would be in direct conflict with state
> law and consequently invalid. Therefore, if . . . [the subject
> of the ordinance] is a mandatory subject of bargaining, a
> city ordinance cannot foreclose collective bargaining on the
> subject. [*Detroit Police Officers Ass'n*, 391 Mich at 58
> (citations omitted).]

Retirement or pension benefits and methods of calcu-
lating them are mandatory subjects of collective bar-
gaining. *Id.* at 63-64; *Lieutenants & Sergeants Ass'n v
City of Riverview*, 111 Mich App 158, 161; 314 NW2d
463 (1981). Accordingly, the existence of an ordinance
that grants the retirement commission the authority to
adopt the actuarial assumptions used to calculate re-
tirement benefits does not foreclose collective bargain-
ing on the issue, and respondents' lack of control over
the retirement commission cannot excuse avoiding
mandatory bargaining under PERA. Moreover, respon-
dent Macomb County has the authority to amend the

ordinance to comply with any term of a bargained agreement and, as just noted, whatever the ordinance may provide, it cannot foreclose statutorily mandated collective bargaining.[6] With regard to the other respondents, we note the ordinance already provides that union members' retirement benefits are controlled by the terms of the members' pertinent CBA. Macomb County Employees' Retirement System Ordinance, § 53b.

Accordingly, we hold, as did the hearing referee and the MERC, that the actuarial assumptions used to calculate the optional forms of benefit payments under the terms of the CBAs are subject to mandatory bargaining under PERA.

---

[6] The dissent agrees with us that employers cannot avoid their duty to bargain over actuarial assumptions that govern pension-benefit amounts and that the assumptions in this case must therefore be subject to bargaining. Curiously, despite its explicit rejection of respondent's view that the duty to bargain does not apply, the dissent also observes that respondent's position "has merit." However, other than a brief discussion of the terms "trustee" and "agent," the dissent fails to explain what it finds meritorious in the argument. Indeed, the distinction between the terms "trustee" and "agent" is fully consistent with the notion that the retirement commission, as a trustee, may act to secure and manage reserves in order to ensure the county's ability to pay the benefits, the amount of which is exclusively a matter for bargaining between the county and its employees.

As for the dissent's concern regarding MCL 46.12a(1)(b), we note that the language cited by the dissent requires that pension or retirement benefits be granted "according to a *uniform scale* for all persons in the same general class or classification." It is clear that a uniform scale is being used here. Each retiree is receiving benefits under the same 100% female/0% male table. The dissent is concerned that the amounts of benefits ultimately received are equal, but that is entirely different from whether a *uniform scale* is used to calculate the benefits. A nonuniform scale would, for example, require that the benefits received by men be calculated using a different mortality table than for those received by women. It was precisely to adopt a uniform scale that the 100% female/0% male table was adopted for all employees, even though separate scales for male and female retirees likely resulted in greater consistency in the actual dollar amount of benefits received by each retiree.

### B. WHETHER THE CBAs ARE AMBIGUOUS IN THE USE OF THE TERM "ACTUARIAL EQUIVALENCE"

Whether the term "actuarial equivalence" is ambiguous or unambiguous determines the standard by which the past actions of the parties may be seen to establish a term or condition of employment. If the term is ambiguous, then a "tacit agreement" that "past practice will continue" renders that practice a term or condition of employment that cannot be unilaterally altered. If the term is unambiguous, then a past practice may constitute a term or condition of employment only if it "is so widely acknowledged and mutually accepted that it amends the contract," i.e., that "the parties had a meeting of the minds with respect to the new terms or conditions so that there was an agreement to modify the contract." *Port Huron*, 452 Mich at 312.

The MERC found that because the retirement ordinance does not provide a definition of "actuarial equivalence," the term is ambiguous. It further found that the past practice of the use of the 100% female/0% male table had become a term or condition of employment under *Port Huron* and therefore could not be unilaterally altered. We agree with the MERC's conclusion that the term "actuarial equivalence" is ambiguous. We also conclude that its findings regarding the past practice were supported by competent, material and substantial evidence. *Amalgamated Transit Union*, 437 Mich at 450.

The only expert testimony in the record regarding actuarial equivalence was provided by a witness for the charging parties. The expert testified that as long as the same assumptions are used for everyone, they are actuarially equivalent, irrespective of whether the benefits themselves are equal in value:

*Q.* So that if I'm 62 and I retire and [someone else] is 65 and he retires, if we live to our life expectancy, we should get the exact or close as can be calculated the same amount of pension benefits from the social security system, right?

*A.* That's the goal, correct.

*Q.* And that goal is known as actuarial equivalence, isn't it?

*A.* I'm not sure. I don't think so.

\* \* \*

*Q.* . . . Is it your understanding that [the GRS report is] saying, look, if you want the surviving spouse options to be the actuarial equivalent of the single life, here's what we do.

*A.* Well, I'm not entirely sure what they mean by actuarially equivalent *because they are by plan definition actuarially equivalent.*

*Q.* But the value--

*A.* The value is different than--I'm sorry. Go ahead.

*Q.* Correct. We talked about that social security example. The value of the benefits were different, right?

*A.* Yes.

*Q.* Those were actuarially equivalent?

*A.* Right.

\* \* \*

*A.* Well, by plan definition actuarial equivalence is using a set of factors, they are equivalent. The plan, when they value these particular benefits, there's a greater value to somebody who elects a life option--I'm sorry, a joint and survivor option than a life benefit.

\* \* \*

*A.* . . . . Individually they're using factors that are neutral and by definition they're actuarially equivalent because that's what they have to be.

\* \* \*

*A.* Well, in terms of valuating a life benefit and a joint and survivorship, you can have a stipulated set of factors that you use in a mortality interest rate and to equate one form to another using those assumptions, they will be equal, in other words, they will be actuarially equivalent based on those assumptions. Like for example, they use the 71 female with a two-year set back. *Every option using those tables is equivalent to every other option.*

*Q.* And even though they're not going to end up being equal?

*A.* Well, now we're talking about how do we value these benefits.

*Q.* Yes.

*A.* The value of those benefits will not be equal because you're using a different set of assumptions to value these benefits.

*Q.* That's what I'm getting at. *There's a difference between being of equal value and being actuarially equivalent?*

*A. Right. I mean actuarially equivalent is usually a term used in a plan document to set the optional forms to another optional form. The valuation of those optional forms is a different matter, whole different assumption set.* They don't have to be different. In most cases they are not the same. They're always different.

*Q.* In most cases the actual valuation is going to be different than what you came up with to be actuarially equivalent to start with?

*A.* Right.

\* \* \*

*Q.* To be actuarially equivalent is really a matter of choosing what factors that you decide will make it actuarially equivalent, is that right?

*A.* Right.

*Q.* Valuation would be I wait and see how long you live. I see how many dollars. I pay it off. I multiply the years times the dollars or times the month and that's a value and they may not be the same for the same people at all?

*A.* They may not be the same.

*Q.* They may be different for male and female?

*A.* Right.

* * *

*Q.* So let me guess. *You could end up having benefits having different values and still be perfectly actuarially equivalent* and plans run that way every day and have for the last 25 years of your experience?

*A.* Yes. [Emphasis added.]

It is abundantly clear from this expert testimony that the MERC had substantial evidence from which to conclude that the term "actuarial equivalence" as used in this case did not unambiguously mean "equal in value."[7]

---

[7] The dissent ignores the testimony and documentary evidence of the parties' use of the term "actuarial equivalence" and instead elects to impose its own definition using a dictionary to define the term despite the fact that the term "actuarial equivalence" cannot be found in the cited dictionary. Although undefined contract terms are generally interpreted in accordance with their "commonly used meaning," *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 113-114; 595 NW2d 832 (1999), courts are not to resort to a lay dictionary for specialized terms of art, particularly in technical fields in which professionals obtain advanced degrees, see *People v Thompson*, 477 Mich 146, 151-152; 730 NW2d 708 (2007). For example, we give tax terms their specialized meanings. *Prod Credit Ass'n of Lansing v Dep't of Treasury*, 404 Mich 301, 312; 273 NW2d 10 (1978) (stating that "terms of art" should be interpreted "in

C. PAST PRACTICE

The MERC concluded that the parties had engaged in a past practice of accepting a 100% female/0% male mortality table for calculation of the optional joint-and-survivor pension and that this practice constituted a "tacit agreement" with respect to the application of the term "actuarial equivalence" as used in the contract that cannot be unilaterally altered. We agree with this conclusion.[8]

We further conclude that, even if "actuarial equivalence" had the unambiguous meaning of "equal in value," the parties' practices over the subsequent 24 years would have constituted a modification of the contract that could not be unilaterally altered.

---

accordance with the experience and understanding of those who would be expected to use and interpret the act"). Similarly, we routinely accept testimony about the meaning of medical and engineering terms of art.

Ignoring this rule, the dissent attempts to craft a definition by breaking the term into component parts, finding definitions for each word, and then rejoining them. The absurdity of attempting this with a technical term is evident when one considers medical terms such as "gall bladder." The dictionary defines "gall" as "[b]itterness of feeling; rancor" and "[o]utrageous insolence," and defines "bladder" as "[a]ny of various distensible membranous sacs . . . found in most animals and that serve as receptacles for fluid or gas." *The American Heritage Dictionary of the English Language* (2001). Adopting the dissent's approach to defining terms of art, the legally binding definition of "gall bladder" would be "a distensible membranous sac found in animals that serves as a receptacle for bitterness of feeling, rancor, and outrageous insolence."

[8] The dissent concludes that the MERC's decision is not supported by competent, material and substantial evidence. However, we reiterate that this Court must be extremely deferential when reviewing the MERC's factual findings. " 'Review of factual findings of the commission must be undertaken with sensitivity, and due deference must be accorded to administrative expertise. Reviewing courts should not invade the exclusive fact-finding province of administrative agencies by displacing an agency's choice between two reasonably differing views of the evidence.' " *St Clair Intermediate Sch Dist v Intermediate Ed Ass'n/MEA*, 458 Mich 540, 553; 581 NW2d 707 (1998) (citation omitted).

[T]he unambiguous contract language controls unless
the past practice is so widely acknowledged and mutually
accepted that it amends the contract. The party seeking to
supplant the contract language must show the parties had
a meeting of the minds with respect to the new terms or
conditions so that there was an agreement to modify the
contract. [*Port Huron*, 452 Mich at 312.]

The record contains the GRS report entitled "Study
Regarding Unisex Mortality Tables," which was pre-
sented to the retirement commission on July 26, 1982.
The report included discussions regarding the effect of
various actions the commission might take and in-
cluded sample male-female blended morality tables
labeled U1 (90% male/10% female), U2 (75% male/25%
female), U3 (50% male/50% female), and U4 (0%
male/100% female). The added costs of these options to
the retirement system as a percentage of payroll were
estimated as follows: U1 (0.01 percent); U2 (0.19 per-
cent); U3 (0.47 percent); U4 (1.01 percent). The retire-
ment commission adopted the U4 (100 percent female)
mortality table for determining optional joint-and-
survivor benefits under the retirement ordinance. The
retirement commission continued using the 100 percent
female mortality table until 2006.

Respondents claim that the adoption of the 100 percent
female table "unknowingly" created unequal payments
and that "it took a team of actuaries to discover the
overpayments in 2006." However, this is not borne out by
the record. The initial GRS study that resulted in the
adoption of the 100 percent female table specifically indi-
cated that there would be an increased cost to the system.
In fact, the 100 percent female table created the *highest*
effect on costs of the four options. In spite of that, the
retirement commission elected to adopt that table. Fur-
ther, as conceded by Macomb County's finance director,
whatever "inequality" was occurring in 2006 had been

occurring over the past 24 years. Moreover, the record
indicates that GRS performed an experience study in 1993
to review the actuarial assumptions the system was using
to calculate benefits and did not recommend any changes
to the system.[9]

In any event, § 15 of the retirement ordinance was
amended shortly after the adoption of the 100 percent
female mortality table to read: "For purposes of determin-
ing actuarial equivalent Retirement Allowances, the Re-
tirement Commission is currently using a $7^{1}/_{2}\%$ interest
rate and a blending of male and female rates based on the
1971 group annuity mortality table projected to 1984 with
ages set back two years." This amendment was clearly
adopted to set the optional joint-and-survivor benefits at
values that were not strictly "equal in value" to those
provided in the straight-life benefit. The original GRS
plan expressly stated:

> COMMENT C: The Retirement System Ordinance pro-
> vides that an optional benefit will be "the actuarial equiva-
> lent" of the standard benefit. The Retirement Commission
> could adopt a rule stating that for purposes of determining

---

[9] The report stated that it would be reasonable to expect that using a
merged gender table would result in "substantially lower benefits than at
present for women electing a joint and survivor benefit, and slightly
higher benefits than at present for men." On the other hand, the report
stated that using all female factors for future retirees would "make sure
that no participant will receive a lesser benefit than under present
procedures." However, this option "would necessarily entail a cost for the
plan since men electing optional forms of payment would be subject to a
smaller reduction in benefits than required on an actuarial basis." Thus,
the record evidence is that the retirement commission selected the 100
percent female table, even though it resulted in the highest costs to the
system, because it left the female benefits the same and increased the
male benefits, as opposed to adopting some other merged table, which
would have left male benefits the same or better, but reduced female
benefits. This suggests that the selection was made without regard to cost
or whether the options were equal in value, but was instead based on how
the adopted table would affect those receiving the benefits.

amounts of optional benefits, the actuarial equivalent will be based upon a stipulated interest rate and unisex mortality table. This could eliminate the need for an ordinance change.

Indeed, GRS's 1982 report went on to provide: "[A] unisex approach subsidizes optional elections for men. If, in recognition of this, more men elect joint and survivor benefits than in the past, cost to the system will be greater than is shown." Thus, the initial GRS study both recognized and explicitly informed the county that adoption of any of the unisex tables could result in optional joint-and-survivor benefits that were not equal in value to those of the straight-life benefits. Rather, every unisex table would, to some degree, create an approach that resulted in greater benefits for men making one of the optional elections. The report went further, suggesting that the retirement commission adopt language designed to circumvent the equivalence requirement by providing an open-ended formulaic definition for "actuarial equivalent" that would be based on an interest rate and unisex mortality table.

Consequently, assuming respondents' definition of "actuarially equivalent" is correct and unambiguous, the retirement commission's selection of the 100 percent female table, in conjunction with respondents' adoption of the suggested language and the continued use of the 100 percent female table for 24 years, even after actuarial review in 1993, represented a "definite, certain, and intentional" modification of the actuarial equivalent requirement that was "unequivocal."[10] See

_____

[10] The dissent contends that the parties' knowledge that the benefits were unequal was insufficient to amend the parties' agreement, citing *Port Huron*, 452 Mich at 332. We agree. That is why we have relied not simply on their knowledge, but their actions to find evidence of an unequivocal modification. We also note that in *Port Huron*, the Court held that there was no evidence that the district had *intentionally* taken

*Port Huron*, 452 Mich at 329. The acceptance of this provision is clear from the language in the controlling CBAs, which provide that retirement benefits are to be continued *"as presently constituted,"* i.e., in accordance with the 100% female/0% male mortality table.

The evidence presented showed that, despite respondents' claim that the clear terms of the CBAs required that the joint-and-survivor pension be "equal in value" to the straight-life pension, for 24 years—from adoption until 2006—the parties continuously used the 100 percent female mortality table without regard to whether it would create equal-in-value pensions. Accordingly, even were respondents correct that the term "actuarial equivalence" as used by the parties was unambiguous, we would still find for the charging parties because the usage of the 100 percent female mortality table was "so widely acknowledged and mutually accepted that it creat[ed] an amendment to the contract."[11] *Port Huron*, 452 Mich at 329.

actions contrary to the agreements; rather, they happened by *happenstances or oversight. Id.* at 332 n 22. Such is clearly not the case here, where there is no happenstance or oversight, but deliberate acceptance based on a clear understanding of the implications. We reject the dissent's conclusion that the GRS reports cannot establish respondents' intent because it was respondents that incorporated language identical to that from the GRS report in the ordinance establishing the adoption of the 100 percent female table. Ironically, the dissent asserts that the 1982 GRS report cannot establish respondents' intent in the same footnote that it acknowledges respondents' amendment of the retirement ordinance in accordance with the report's recommendation. The amendment is necessarily tied to the report. Accordingly, it is appropriate to use it in determining their intent. In any event, the dissent fails to provide or cite any facts in the record that are inconsistent with the MERC's findings.

[11] The dissent alludes to the fact that not permitting the retirement commission to change the actuarial tables used to calculate the retirement benefits could potentially destabilize the retirement funds. However, there is no evidence in the record to support such an assertion, nor has the commission concluded that additional funding is either necessary or unavailable. Thus, the dissent's expression of concern about the financial stability of the retirement system appears to be intended to inflame rather than clarify. Moreover, our conclusion that the parties had

IV. CONCLUSION

In sum, we agree with the MERC that the term "actuarial equivalence" is ambiguous and that a past practice of accepting a 100% female/0% male mortality table constituted a tacit agreement by the parties that that table would continue to be used. We further conclude that, even if "actuarial equivalence" had the unambiguous meaning of "equal in value," there was sufficient evidence of a meeting of the minds that the 100% female/0% male table was accepted for calculating pension benefits in lieu of any "equal in value" requirement that the table could not be unilaterally changed. Accordingly, we agree with the MERC that "[r]espondents violated their duty to bargain when, without bargaining, they changed the method used to calculate joint and survivor benefits under the parties' collective bargaining agreements."[12]

Affirmed.

FITZGERALD, J., concurred with SHAPIRO, J.

---

a past practice of using the 100 percent female table does not prevent the parties from selecting a new table. It merely requires that they do so at the bargaining table rather than by a unilateral change.

Finally, the dissent's claim that the use of a gender-neutral table based on a 100 percent female assumption results in inequities constitutes a criticism of using a gender-neutral table at all. Any gender-neutral table will invariably result in some difference in payments given that women in fact do generally live longer than men and that this reality cannot, by definition, be reflected in a gender-neutral table. Moreover, the dissent's assertion that the commission "did not accept a sex-blended mortality table until 2006" is simply wrong. A 100 percent female table is still a sex-blended mortality table; the blending just assumes zero percent men. What makes it a sex-blended table is that the same assumptions are used for everyone, as opposed to having different tables to calculate benefits for men and women.

[12] In light of our conclusion, we do not address the charging parties' claim that respondents had a separate duty to bargain over the effects of implementing the new mortality table.

Markey, P.J. (*dissenting*). I respectfully dissent. I
conclude that respondents did not commit an unfair
labor practice (ULP) when the Macomb County Retire-
ment Commission adopted new mortality tables to
ensure that optional retirement benefits that include
payment to a surviving beneficiary are the actuarial
equivalent of the negotiated defined-benefit straight-
life pension. I would hold that the retirement commis-
sion is vested with the authority to determine mortality
tables and actuarial assumptions necessary to ensure
"actuarial equivalence" of optional retirement benefits,
and that the matter is not subject to mandatory bar-
gaining under the public employment relations act
(PERA), MCL 423.201 *et seq*. But even if it is, the
matter was "covered by" the parties' collective bargain-
ing agreements (CBAs); consequently, respondents sat-
isfied their duty to bargain in good faith. I would also
hold that the Michigan Employment Relations Commis-
sion (MERC) erred by ruling that the parties had tacitly
amended the clear and unambiguous language of the
parties' contracts. The MERC's finding is not supported
by competent, material, and substantial evidence on the
whole record. I conclude that it is a substantial and
material error of law. Because this Court cannot cure
these errors by conducting its own fact-finding under
the higher standard required to overcome the clear and
unambiguous terms of the parties' CBAs, I would
reverse and remand for dismissal of the ULP charges.

I. ANALYSIS

Respondents assert three arguments on appeal.
First, respondents argue that the hearing referee cor-
rectly determined that respondents had satisfied their
duty to bargain in good faith because the matters the
charging parties wished to negotiate were already "cov-

ered by" the CBAs. Second, respondents contend that the MERC's decision is unsupported by evidence or legal authority and that the mistaken overpayment of optional benefits with rights of survivorship greater than the "actuarial equivalent" of a straight-life benefit cannot tacitly amend the unambiguous language of the CBAs or the Macomb County Employees' Retirement System Ordinance (the retirement ordinance or the ordinance). Respondents assert that, at best, the charging parties have alleged a breach of a disputed term of the CBAs for which the contract remedy of arbitration is available. Finally, respondents argue that they have no duty to bargain over actuarial assumptions that are within the sole discretion of the commission and that such bargaining might threaten the financial integrity of the pension system. The commission, respondents assert, must be able to determine actuarial assumptions to fulfill its statutory fiduciary duty to maintain the financial integrity of the pension system. Respondents argue that actuarial equivalence cannot have varying bargained definitions and that the determination of actuarial assumptions to ensure that optional benefits are the actuarial equivalent of bargained defined benefits is a fiduciary responsibility vested in the commission by both the ordinance and the CBAs. I agree.

A. MANDATORY BARGAINING

The primary question presented in this appeal is whether the actuarial assumptions made to ensure that optional forms of benefit payments are the actuarial equivalent of straight-life retirement benefits determined under the terms of the CBAs are subject to mandatory bargaining under PERA. The hearing referee, the MERC, and the majority reject respondents' contention that they have no duty to bargain over

actuarial assumptions because they lacked control over the issue, citing *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44; 214 NW2d 803 (1974), and *Detroit Police Officers Ass'n v Detroit*, 212 Mich App 383; 538 NW2d 37 (1995), aff'd 452 Mich 339 (1996). I agree that respondents cannot, on the basis of lack of control over the retirement commission, avoid *their* duty to bargain in good faith *if* the actuarial assumptions at issue are mandatory subjects of collective bargaining under PERA. See *Detroit Police Officers Ass'n*, 391 Mich at 58; *Detroit Police Officers Ass'n*, 212 Mich App at 389-390. However, I agree with respondents and conclude that the actuarial assumptions the commission uses to ensure that optional forms of benefit payments are the actuarial equivalent of the bargained primary straight-life retirement benefit are *not* mandatory topics of bargaining within the meaning of "wages, hours, and other terms and conditions of employment" under MCL 423.215(1).

PERA extends its duty to bargain in good faith over "wages, hours, and other terms and conditions of employment," MCL 423.215(1), to public employers "or an officer or agent of a public employer," MCL 423.210(1). PERA does not define "public employer," but it may be inferred from the definition of "public employee," MCL 423.201(e), that "public employer" includes the government of this state, the government of one of its political subdivisions, or boards, commissions, public school districts or any other branch of the public service that appoints or employs persons. The general characteristics of employers are "(1) that they select and engage the employee; (2) that they pay the wages; (3) that they have the power of dismissal; and (4) that they have power and control over the employee's conduct." *Saginaw Stage Employees, Local 35, IATSE v City of Saginaw*, 150 Mich App 132, 134-135; 387 NW2d 859 (1986).

Consequently, the retirement commission is not the public employer of the charging parties' members, so the commission has no duty to bargain with the charging parties regarding terms and conditions of employment unless the commission acts as the agent of respondents.

An "agent" is " 'a person having express or implied authority to represent or act on behalf of another person, who is called his principal.' " *Stephenson v Golden*, 279 Mich 710, 734; 276 NW 849 (1937), quoting Bowstead, Agency (4th ed), p 1. Similarly, Black's Law Dictionary (8th ed) defines "agent" as "[o]ne who is authorized to act for or in place of another[.]" On the other hand, a trustee is not an agent. " 'An agent represents and acts for his principal, who may be either a natural or artificial person. A trustee may be defined generally as a person in whom some estate, interest, or power in or affecting property is vested for the benefit of another.' " *Bankers Trust Co of Detroit v Russell*, 263 Mich 677, 682; 249 NW 27 (1933), quoting *Taylor v Davis' Administratrix*, 110 US 330, 334-335; 4 S Ct 147; 28 L Ed 163 (1884).

The facts and law in this case establish that the retirement commission is a trustee, not an agent. "If a county establishes a plan for the payment of pension and retirement benefits to its employees pursuant to this section, the county board of commissioners may provide for a board of trustees to administer the plan and for the manner of election or appointment of the members of the board of trustees." MCL 46.12a(12). The retirement ordinance creates and vests the retirement commission with "the general administration, management and responsibility for the proper operation of the Retirement System, and for construing and making effective the provisions of this Ordinance."

Macomb County Employees' Retirement System Ordinance, § 3. It is undisputed that the commission has never represented respondents in its bargaining with the charging parties; respondents have not authorized the commission to bargain on their behalf with representatives of their employees. Thus, as respondents argue, they cannot directly control decisions made by the commission. But neither may respondents avoid *their* duty to bargain in good faith on this basis *if* the actuarial assumptions at issue are mandatory subjects of bargaining under PERA.

I also conclude that the hearing referee properly rejected respondents' policy argument on the basis of MCL 46.12a(11), which requires that if the county establishes a pension plan, it "shall establish and maintain reserves on an actuarial basis in the manner provided in this subsection sufficient to finance the pension and retirement and death benefit liabilities under the plan and sufficient to pay the pension and retirement and death benefits as they become due." The hearing referee distinguished actuarial assumptions used to determine whether the retirement system is adequately funded, which are not the subject of bargaining, *Bd of Trustees of the Policemen and Firemen Retirement Sys of Detroit v Detroit*, 270 Mich App 74; 714 NW2d 658 (2006), from those used to calculate pension benefits with survivorship rights.

Even though I reject respondents' arguments regarding their lack of control and based on MCL 46.12a(11), I conclude that other reasons support a finding that actuarial assumptions necessary to ensure that optional forms of pension benefits are the "actuarial equivalent" of bargained straight-life retirement benefits are not mandatory subjects of bargaining under PERA. I believe these reasons justify finding that the retirement

commission has the responsibility under state law, as well as the retirement ordinance and the CBAs, to ensure that optional forms of pension benefits payable to similarly situated retirees are actuarially equivalent. I disagree with the MERC and the majority that the term "actuarial equivalent" might be ambiguous because it is not defined in either the retirement ordinance or state law. A term in a statute or contract is not rendered ambiguous because it is undefined. Rather, words are construed according to their plain and ordinary meaning, with consultation of a dictionary if necessary, unless it is clear a term is a legal term of art having peculiar meaning. *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008); *Terrien v Zwit*, 467 Mich 56, 76; 648 NW2d 602 (2002).

The *Random House Webster's College Dictionary* (1997) defines the root word "actuary" as "a person who computes insurance premium rates, dividends, risks, etc., based on statistical data." It also defines "equivalence" as "the state or fact of being equivalent; equality in value, force, significance, etc." In the context of the CBAs and the retirement ordinance, which plainly require that optional retirement benefits payable over the life of a retiree and a surviving beneficiary be the "actuarial equivalent" of the retiree's straight-life retirement allowance, these definitions require that "actuarial equivalent" mean that optional benefits that include payments to a survivor be equal in value to the straight-life benefit on the basis of statistical data regarding mortality and other factors such as the rate of interest. This meaning of "actuarial equivalent" is consistent with the evidence presented at the hearing before the hearing referee, who concluded, despite some obfuscating testimony by the charging parties' expert, that "[b]oth [Gabriel, Roeder and Smith (GRS), the commission's actuary], from the evidence of its reports,

and the UAW's expert witness appear to agree that the precise definition of 'actuarially equivalent' is 'equal based on the same set of actuarial assumptions.' " The retirement system's December 2003 annual actuarial valuation, which was admitted at the MERC hearing below, also defined "actuarial equivalent" as "[a] single amount or series of amounts of equal value to another single amount or series of amounts, computed on the basis of the rate(s) of interest and mortality tables used by the plan." Similarly, the Attorney General opined that the meaning of "actuarial equivalent" in MCL 46.12a(1)(b) requires "receipt of benefits of equal value, and not approximate value, with reference to those benefits enjoyed by other retirants . . . ." OAG, 1981-1982, No 5846, p 32 (January 22, 1981). So, requiring that optional retirement benefits payable over the life of a retiree and a surviving beneficiary be the "actuarial equivalent" of the retiree's straight-life retirement allowance means that optional retirement benefits be equivalent or equal in value on the basis of actuarial assumptions.

It is undisputed that using 100 percent female mortality tables to calculate "actuarial equivalent" optional retirement benefits payable over the life of a retiree and a surviving beneficiary results in the optional benefits being more valuable than the straight-life benefit. This inequality is contrary to the plain terms of the CBAs and the retirement ordinance. It also results in the retirement system's paying more benefits than are provided for in the CBAs and the retirement ordinance and, in turn, makes it more difficult for respondents to satisfy their obligation to maintain the financial stability of the retirement system. Moreover, rather than achieving sex neutrality in pension benefits and obligations, using 100 percent female mortality tables disproportionately favors male retirees.

The retirement commission in 2006, pursuant to § 15 of the ordinance,[1] selected a true sex-blended mortality table that reflected the actual experience of the retirement system. The 2006 GRS experience study determined that using 60 percent male and 40 percent female blended mortality tables would provide actuarial equivalence between a straight-life benefit and optional benefits with rights to a surviving beneficiary. The 60% male/40% female ratio reflected the actual experience of county retirees selecting the more valuable optional benefits despite the fact that the county work force is 74 percent female and 24 percent male. These ratios may reflect that when ready to retire, females are less likely to have someone in whom they have an insurable interest who may be nominated as a survivor or they may reflect the fact that females are less likely to need or desire to provide benefits to a survivor. If bargaining regarding mortality tables and other assumptions used to calculate equality of value is allowed, it would permit continued disparity of value between optional retirement and straight-life benefits. Indeed, bargaining increases the likelihood that optional benefits will continue to differ in value from the defined straight-life benefit.

I read state legislation enabling county retirement systems such as the one at issue here as implicitly, if not explicitly, requiring that optional forms of retirement benefits available to similarly situated retirees be "actuarially equivalent" and that the determination of actuarial assumptions on the basis of the statistical experience of the retirement system is vested in the

---

[1] "The Retirement Commission shall from time to time adopt such mortality and other tables of experience, and a rate or rates of regular interest, as are necessary in the Retirement System on an actuarial basis." Macomb County Retirement Ordinance, § 15.

system's board of trustees, here the retirement commission. MCL 46.12a(1)(b) provides in pertinent part: "A plan adopted for the payment of retirement benefits or a pension shall grant benefits to an employee eligible for pension or retirement benefits according to *a uniform scale for all persons in the same general class or classification.*" (Emphasis added). I conclude that permitting an optional retirement benefit with rights of survivorship that is more valuable than a straight-life benefit violates the rule of uniformity "for all persons in the same general class or classification."

In addition, MCL 46.12a(12) provides that a county retirement plan "may provide for a board of trustees to administer the plan and . . . may grant authority to the board of trustees to fully administer and operate the plan . . . within the limitations . . . in the plan." This subsection also provides that the county retirement plan

> may provide for financing, funding, and the payment of benefits in the same manner and to the same extent as is provided for in the state employees' retirement act, 1943 PA 240, MCL 38.1 to 38.69, and the municipal employees retirement act of 1984, 1984 PA 427, MCL 38.1501 to 38.1555 . . . . [*Id.*]

The State Employees' Retirement Act (SERA) vests the state retirement board with the obligation and authority to conduct an actuarial investigation at least once every five years:

> At least once in each 5 year period, the retirement board shall cause an actuarial investigation to be made into the mortality, service, compensation, and other experience of the members and beneficiaries of the retirement system. Upon the basis of such actuarial investigation the retirement board shall adopt such tables as are deemed necessary for the proper operation of the retirement system and for making effective the provisions of this act. [MCL 38.7.]

SERA, like the retirement ordinance here, offers optional retirement benefits that include survivorship rights to a beneficiary provided they are the "actuarial equivalent" of the straight-life benefit. MCL 38.31(1). Although MCL 38.49(8) specifies an assumed interest rate and use of "the 1983 group annuity and mortality table" for the purpose of determining actuarial equivalence for certain optional retirement benefits, SERA does not suggest that the authority vested in the state retirement board to ensure that optional benefits are the actuarial equivalent of the regular straight-life retirement allowance is subject to collective bargaining under PERA. Reading MCL 46.12a(1)(b) and MCL 46.12a(12) in light of SERA, I believe that the Legislature intended that county retirement plans require optional benefits with rights of survivorship be the actuarial equivalent of straight-life benefits determined by bargained factors and that the determination of mortality tables and other actuarial assumptions to maintain actuarial equivalence be vested with the retirement commission.

This conclusion is consistent with caselaw holding "that pension and retirement provisions are mandatory subjects of bargaining" under PERA. *Detroit Police Officers Ass'n*, 391 Mich at 63-64. The parties have bargained and will continue to bargain over formulas for determining eligibility for retirement and for calculating pension benefits on the basis of age, years of service, final average compensation, and other factors. The parties have bargained and will continue to bargain over the availability of optional forms of benefit payments that may include payments to a surviving beneficiary. The only matter within the discretion of the retirement commission is the determination of mortality tables and actuarial assumptions, on the basis of the actual experience of the retirement system's members

and beneficiaries, so that optional benefits remain the "actuarial equivalent" of each other. This will also ensure that regardless of which pension benefit similarly situated retirees select, retirement benefits will be paid "according to a uniform scale for all persons in the same general class or classification." MCL 46.12a(1)(b).

### B. MORTALITY TABLES ARE "COVERED BY" THE PARTIES' AGREEMENTS

To the extent that the mortality tables and the actuarial assumptions the retirement commission uses to determine actuarial equivalence of optional pension benefits are mandatory topics of collective bargaining, the matter is "covered by" the parties' CBAs. Consequently, respondents satisfied their duty of good-faith bargaining.

Under § 15 of PERA, MCL 423.215(1), a public employer has a duty to bargain in good faith over subjects found within the scope of the phrase "wages, hours, and other terms and conditions of employment." See *Detroit Police Officers Ass'n*, 391 Mich at 54. I agree that, generally, retirement or pension benefits and methods of calculating them are mandatory subjects of collective bargaining. *Id.* at 63-64; *Lieutenants & Sergeants Ass'n v City of Riverview*, 111 Mich App 158, 161; 314 NW2d 463 (1981). A public employer commits an unfair labor practice if it refuses to bargain in good faith regarding a mandatory subject of collective bargaining or takes unilateral action on the subject absent an impasse in the negotiations. MCL 423.210(1)(e); *Detroit Police Officers Ass'n*, 391 Mich at 54-55. A public employer also "commits an unfair labor practice if, before bargaining, it unilaterally alters or modifies a term or condition of employment, unless the employer has fulfilled its statutory obligation or has been freed from it." *Port Huron*

*Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309, 317; 550 NW2d 228 (1996). An employer satisfies its duty by bargaining about a subject and "memorializing resolution of that subject in the collective bargaining agreement" or by establishing that "the union has waived its right to demand bargaining." *Id.* at 318.

Assuming that mortality tables and other actuarial assumptions are subject to mandatory bargaining, and because respondents do not assert that the charging parties waived their right to bargain, the question presented is whether the matter the charging parties assert should be negotiated is "covered by" or is "contained in" the CBAs. *Port Huron Ed Ass'n*, 452 Mich at 318, citing *Dep't of Navy v Fed Labor Relations Auth*, 295 US App DC 239, 247; 962 F2d 48 (1992). When a matter is "covered by" a CBA, whether the union has waived its rights is irrelevant. *Port Huron Ed Ass'n*, 452 Mich at 319; *Dep't of Navy*, 295 US App DC at 248. Thus, when analyzing an ULP charge, the first step is to determine if the parties' CBA "covers" the matter in dispute. *Port Huron Ed Ass'n*, 452 Mich at 321. If the disputed matter is "covered" by the CBA, "the details and enforceability of the provision are left to arbitration." *Id.* A matter can be "covered by" by a CBA without the matter being explicitly mentioned. *Id.* at 322 n 16.

In this case, all the CBAs provide formulas for determining eligibility for retirement and for calculating pension benefits on the basis of age, years of service, final average compensation, and other factors. All except the AFSCME Local 893 CBA recognize that the retirement benefit an employee may earn is a defined benefit for the life of the retiree but that an actuarially equivalent reduced benefit payable over the joint lives of the retiree and a beneficiary is available under the

county retirement ordinance. Further, the parties' agreements incorporate the retirement ordinance by providing that the employer "shall continue the benefits as provided by the presently constituted . . . Ordinance, and the Employer and the employee shall abide by the terms and conditions thereof . . . ." Apparently then, the parties have agreed that the retirement benefit employees may earn is a straight-life benefit under § 22 of the ordinance or an actuarially equivalent reduced benefit payable over the joint lives of the retiree and a beneficiary under § 26. Moreover, by agreeing to be bound by the retirement ordinance, the parties have also agreed that the retirement commission "shall from time to time adopt such mortality and other tables of experience, and a rate or rates of regular interest, as are necessary in the Retirement System on an actuarial basis." Macomb County Retirement Ordinance, § 15. Consequently, retirement benefits and the methods used to calculate them—including mortality tables and actuarial assumptions—are "covered by" the parties' CBAs. Respondents have therefore satisfied their duty of bargaining in good faith over retirement benefits. *Port Huron Ed Ass'n*, 452 Mich at 322; *Detroit Police Officers Ass'n*, 391 Mich at 55.

This analysis also applies to the CBA between the Macomb County Road Commission and Local 893. That agreement refers to the retirement ordinance and benefit options for spouses. Because a subject is not comprehensively addressed in the CBA does not mean it is not "covered by" it. *Gogebic Community College Mich Ed Support Personnel Ass'n v Gogebic Community College*, 246 Mich App 342, 350; 632 NW2d 517 (2001).

This analysis is also unaffected by the fact that the term "actuarial equivalent" is not defined in either the retirement ordinance or the CBAs. As previously dis-

cussed, the term is not ambiguous in the context of pension benefits. Moreover, to the extent the charging parties believe anything in the CBAs or the retirement ordinance requires the continued use of mortality tables and actuarial assumptions adopted in 1982, they have a readily available contract remedy. "If the term or condition in dispute is 'covered' by the agreement, the details and enforceability of the provision are left to arbitration." *Port Huron Ed Ass'n*, 452 Mich at 321.

Consequently, even assuming that mandatory bargaining applies, I conclude that respondents have satisfied their duty to do so in good faith because retirement benefits and methods of calculating them are "covered by" the parties' CBAs. Respondents are not guilty of violating MCL 423.210(1)(e), and the ULP charges should have been dismissed.

### C. THE PARTIES DID NOT TACITLY AMEND THE CBAS

I respectfully disagree with the majority that there was sufficient evidence to find that the parties by past practice have amended their CBAs to remove from the retirement commission the discretion to adopt "from time to time . . . such mortality and other tables of experience, and a rate or rates of regular interest, as are necessary in the Retirement System on an actuarial basis." Macomb County Retirement Ordinance, § 15. I would reverse the decision of the MERC and vacate its order because its findings are not supported by competent, material, and substantial evidence on the whole record and its holding that the clear and unambiguous language of the parties' contracts was tacitly amended constitutes a substantial and material error of law. First, the MERC erred by finding that the parties' CBAs were ambiguous. Second, the MERC erred by applying the wrong legal standard to determine that the parties

tacitly amended their CBAs by lengthy acquiescence to the retirement commission's use of 100 percent female mortality tables for the purpose of determining that optional retirement benefits were the actuarial equivalent of a straight-life benefit.

By finding that the parties tacitly amended their CBAs, the MERC must necessarily have found an ambiguity in the parties' CBAs because a past practice of the parties cannot tacitly amend unambiguous terms of the parties' agreement to the contrary. *Port Huron Ed Ass'n*, 452 Mich at 325-326; *Gogebic Community College*, 246 Mich App 352. The MERC erroneously applied the tacit amendment standard of *Amalgamated Transit Union*, 437 Mich at 454-455. As later explained in *Port Huron Ed Ass'n*, 452 Mich at 325, this standard only applies "[w]here the collective bargaining agreement is ambiguous or silent on the subject for which the past practice has developed . . . ." A higher standard must be employed with respect to the unambiguous terms of a CBA in order to facilitate the primary purpose of PERA: promotion of "collective bargaining to reduce labor-management strife." *Id.* at 326. To require a party to return to the bargaining table about a matter clearly set forth in a contract requires proof that the parties "knowingly, voluntarily, and mutually agreed to new obligations." *Id.* at 327. The proof necessary to meet this higher standard must be " 'clear and unmistakable' " and " 'substantially stronger evidence than when utilized to interpret ambiguous language or to fill in areas where the contract is silent.' " *Port Huron Ed Ass'n*, 452 Mich at 327-328 (citations omitted). The " 'highest quantum of proof will ordinarily be required in order to show that the parties intended by their conduct to amend or modify clear and unambiguous contractual language . . . .' " *Id.* at 329 (citation omitted). Under this higher standard, that "a

party 'knew or should have known' it was acting contrary to the agreement is insufficient to overcome express language of the agreement." *Port Huron Ed Ass'n*, 452 Mich at 332.

Although an ambiguity or the failure of a CBA to "cover" a topic is necessary to apply the tacit amendment standard, *id.* at 327-330, the MERC did not clearly state what parts of the CBAs are ambiguous. The MERC suggested that the term "actuarial equivalent" is ambiguous by noting the term is not defined in the retirement ordinance. This term appears in both the CBAs and the retirement ordinance and, as discussed already, is not ambiguous. In the context of the CBAs and the retirement ordinance, the term means that the optional benefits be equal in value to the straight-life benefit on the basis of statistical data regarding mortality. Moreover, the issue in this case is not the meaning of "actuarial equivalent," but how or who determines the mortality tables and other actuarial assumptions by which actuarial equivalence is established. On this pertinent question there is no ambiguity in either the CBAs or the retirement ordinance. The parties in all but one of the CBAs explicitly agreed to be bound by the terms of the retirement ordinance. The one exception, the agreement between the road commission and AFSCME Local 893, implicitly, if not explicitly, deferred to the retirement ordinance as governing optional retirement benefits, and hence the meaning of "actuarial equivalent." The retirement ordinance clearly and unambiguously declares that the retirement commission "is vested [with] the general administration, management and responsibility for the proper operation of the Retirement System, and for construing and making effective the provisions of this Ordinance." Macomb County Retirement Ordinance, § 3. Moreover, the retirement ordinance unambiguously

provides that the retirement commission "shall from time to time adopt such mortality and other tables of experience, and a rate or rates of regular interest, as are necessary in the Retirement System on an actuarial basis." Macomb County Retirement Ordinance, § 15.

The retirement commission's long use of a 100 percent female mortality table to determine that optional retirement benefits were the actuarial equivalent of a straight-life benefit is not the clear and unmistakable evidence necessary to overcome the clear and unambiguous terms of the parties' CBAs and the retirement ordinance. On the contrary, it is evidence confirming the plain terms of the CBAs and the retirement ordinance that vests the authority in the commission to from "time to time adopt such mortality and other tables of experience, and a rate or rates of regular interest, as are necessary . . . ." It also does not evidence that the "parties knowingly, voluntarily, and mutually agreed" to amend the CBAs. Similarly, the longtime overpayment of optional benefits that were not "the 'actuarial equivalent' of straight life pensions" cannot overcome the express language of the CBAs and the retirement ordinance that vests the authority in the commission to adopt mortality tables and rates of interest as necessary on an actuarial basis. Even if the parties knew or should have known that the use of 100 percent female mortality tables resulted in optional benefits being more valuable than straight-life benefits, that knowledge was not enough to amend the parties' agreements.[2] "Simply because a party 'knew or should

---

[2] Because the retirement commission is not an agent of respondents, the commission's 1982 action cannot be evidence of respondents' intent to "knowingly, voluntarily, and mutually" amend the CBAs. Likewise, the 1982 GRS report cannot establish respondents' intent. Moreover, adding the language "[f]or purposes of determining actuarial equivalent Retirement Allowances, the Retirement Commission is currently using a $7^{1}/2\%$

have known' it was acting contrary to the agreement is insufficient to overcome express language of the agreement." *Port Huron Ed Ass'n*, 452 Mich at 332.

## II. CONCLUSION

I would hold that the retirement commission is vested with the authority to determine mortality tables and actuarial assumptions necessary to ensure "actuarial equivalence" of optional and straight-life retirement benefits and that this matter is not a mandatory subject of bargaining under PERA. But even if mortality tables and actuarial assumptions were mandatory subjects of bargaining, I would conclude for the reasons discussed in part I(B) that respondents satisfied their duty of good-faith bargaining because retirement benefits and methods of calculating them were "covered by" the parties' CBAs.

Finally, for the reasons discussed in part I(C), I would also reverse the MERC's decision and order because it is not supported by competent, material, and substantial evidence on the whole record and its holding that the clear and unambiguous language of the parties' contracts was tacitly amended constitutes a substantial and material error of law. I would, therefore, reverse the MERC's decision, vacate its order, and remand this

interest rate and a blending of male and female rates based on the 1971 group annuity mortality table projected to 1984 with ages set back two years" to § 15 of the ordinance does not limit the preceding sentence of that section. Further, the retirement commission did not adopt a sex-blended mortality table until 2006. At best, the evidence the majority relies on would only support a finding that respondents knew or should have known that using the 100 percent female mortality tables would result in optional retirement benefits that were not the actuarial equivalent of a straight-life benefit. That knowledge is insufficient to amend the clear and unambiguous language of the parties' agreements. *Port Huron Ed Ass'n*, 452 Mich at 332.

matter for entry of an order dismissing the charging parties' unfair labor practice charges under MCL 423.210(1)(e).